**In the Matter of the WELFARE OF S.J.**

**No. C3–84–1927.**

Court of Appeals of Minnesota.

May 14, 1985.

William R. Kennedy, Hennepin County Public Defender, David M. Duffy, Asst. Public Defender, Minneapolis, for appellant/Father.

Hubert H. Humphrey, III, Atty. Gen. of Minnesota, St. Paul, Thomas L. Johnson, Hennepin Co. Atty., James Bares, Asst. Co. Atty., Minneapolis, for respondent/County.

Bruce C. Hanley, Minneapolis, for respondent/Child.

Heard, considered and decided by FOLEY, P.J., and FORSBERG and LESLIE, JJ.

## OPINION

LESLIE, Judge.

This is an appeal by S.J.'s father from a judgment which determined that S.J. was a dependent and neglected child and which ordered continued supervised visitation. We affirm.

## FACTS

S.J. is a mildly retarded child, afflicted with Down's syndrome. At the time of the hearing on this matter her chronological age was seven, although her mental age was between three and four. S.J. is the only child of Joan J. and the appellant, Wallace J. In September 1982 the appellant and his wife separated and, when neither parent felt able to properly care for her, S.J. was placed in a foster home.

The appellant often picked up S.J. from her foster parents' home and brought her to his home for visits on Saturdays. At first S.J. was generally happy when she returned to her foster home from these visits, but in December 1982 her foster mother began to notice a change in S.J.'s behavior. On December 19, 1982 the appellant asked S.J.'s foster mother to dress S.J. in a party dress because he wanted to take

her to see Santa Claus, but when the appellant returned S.J. she was dressed in different clothes, which were inappropriate for December weather. When S.J.'s foster mother questioned the appellant about S.J.'s dress, he replied that she had fallen asleep while watching television, had wet herself and had required a bath and a change of clothing.

S.J. came back from the December 19 visit very weepy, extremely hyperactive, and more aggressive than usual. According to her foster mother, that evening S.J. also wet her bed more than usual and banged her head against the wall more than usual. She complained of being bathed and of having to take naps during her visit.

Following other visits to her father's home on January 15, 22 and 29, S.J. exhibited the same excessive behavior, and continued to complain of having to take baths and naps. After the January 22 visit, the appellant again returned S.J. in different clothing, and on January 29 S.J. returned from her visit crying uncontrollably.

In late January S.J.'s foster mother observed S.J. insert a toy thermometer into her vagina, and on two other occasions S.J. inserted a plastic fork and a toy block into her vagina.

On January 31, S.J.'s foster mother called S.J.'s social worker to discuss the changes in her behavior. The social worker referred the case to Patricia Batko, a social worker with Hennepin County Child Protection, who interviewed S.J. on February 4. After spending five or ten minutes with S.J. building rapport, Batko began questioning S.J. about her visits with her natural parents. S.J. complained to Batko that she had to take baths and naps while visiting the appellant, and said that after her baths the appellant would touch her on her "bottom" with his "bottom". S.J. refers to both the male and female genitals and buttocks as the "bottom". At this point—approximately 15 minutes into the interview—Batko introduced S.J. to anatomically correct dolls. When S.J. was told to pretend that the female doll was herself,

she undressed the doll, placed it on the floor face down, and said the appellant touched her with his bottom, that he also touched her on her breast area with his bottom and that she touched him on his bottom with a washcloth, although she did not like doing that. When Batko asked S.J. if anyone else had behaved in that way towards her she said no. S.J. also indicated that the appellant had told her not to tell anyone what he did.

On February 16 and 25, Batko interviewed S.J. in the presence of a police officer, and S.J. again talked about the appellant touching her on the bottom.

Batko referred the case to Susan DeVries, a licensed psychologist with the Center for Child and Family Therapy. DeVries began play therapy in March, and met with S.J. weekly until September. During her second session, DeVries asked S.J. to identify her body parts and asked her who touched her bottom. S.J. responded that the appellant touched her bottom. During subsequent sessions S.J. demonstrated what had occurred by pressing the male doll's genitals into the female doll's genital area and by placing the dolls' mouths next to the other dolls' genital areas.

Upon several occasions DeVries did elicit from S.J. some confusing and conflicting information. At one point although S.J. put the male doll's mouth next to the female doll's genital area, S.J. said the appellant did not touch her with his mouth. She also stated that although the appellant touched her bottom and that it felt nice, her mother had "told her that." After indicating that the appellant put his fingers in her bottom, S.J. then stated that he did not touch her with anything besides his bottom. In other sessions with DeVries, however, S.J.'s statements and demonstrations on the dolls were consistent.

S.J. was interviewed by Dr. Pi-Nian Chang, a licensed psychologist, who conducted an independent evaluation of the case on behalf of the appellant. During one session Dr. Chang showed S.J. several pictures of bears as a part of the Child Apperception Test. When S.J. viewed a

picture of a young bear sitting on an adult male bear's lap and described acts which were not depicted in the picture, Dr. Chang brought out anatomically correct dolls for further explanation. S.J. without any prompting removed the clothes from the dolls and placed the male doll on top of the female doll, saying "Daddy touches the baby bear's bottom." From this and other tests, Dr. Chang concluded that S.J.'s responses were conditioned. However, at trial Dr. Noel Larson, a licensed consulting psychologist and a specialist in the area of incest, rebutted Dr. Chang's testimony by questioning his methodology and work-up.

Based upon the above facts and after a full hearing, the trial court concluded that S.J. was a dependent and neglected child with respect to the appellant within the meaning of Minn.Stat. § 260.015 subds. 6(b), 6(d), 10(b) and 10(e). The court ordered that S.J. remain in her present foster home and that visits by the appellant continue to be supervised. The appellant challenges the court's decision, claiming that the allegations in the petition were not sufficiently proved and that the court erroneously admitted hearsay testimony of Patricia Batko regarding her conversations with S.J.

## ISSUES

1. Were the allegations of dependency and neglect proved by clear and convincing evidence?

2. Did the trial court properly admit testimony of Patricia Batko over the hearsay objections of the appellant?

## ANALYSIS

*1. Sufficiency of the evidence.*

 It must be presumed that a natural parent is a fit and suitable person to be entrusted with the care of his child. *In re Welfare of M.M.B.*, 350 N.W.2d 432, 434 (Minn.Ct.App.1984). In light of this presumption, allegations in a dependency and neglect petition must be proved by clear and convincing evidence—a burden higher than the normal preponderance of the evi-

dence burden imposed upon civil litigants. *See In re Welfare of V.R.*, 355 N.W.2d 426, 431 (Minn.Ct.App.1984); *In re Welfare of C. Children*, 348 N.W.2d 94, 96 (Minn.Ct. App.1984); Minn.R.Juv.P. 59.05. Despite this higher burden of proof, however, review by this court is still limited to a determination whether the trial court's findings are "supported by substantial evidence and are not clearly erroneous", *In re Welfare of C. Children*, 348 N.W.2d at 97, *citing* Minn.R.Civ.P. 52.01 and *In re Welfare of J.M.S.*, 268 N.W.2d 424, 428 (Minn.1978).

The court found that S.J. is dependent and neglected within the meaning of four statutory provisions:

Subd. 6. "Dependent child" means a child:

\* \* \* \* \* \*

(b) Who is in need of special care and treatment required by his physical or mental condition and whose parent, guardian, or other custodian is unable to provide it; or

\* \* \* \* \* \*

(d) Who is without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of his parent, guardian, or other custodian.

\* \* \* \* \* \*

Subd. 10. "Neglected child" means a child:

\* \* \* \* \* \*

(b) Who is without proper parental care because of the faults or habits of his parent, guardian, or other custodian; or

\* \* \* \* \* \*

(e) Whose occupation, behavior, condition, environment or associations are such as to be injurious or dangerous to himself or others; \* \* \*

Minn.Stat. § 260.015 (1982).

 The appellant argues that there was insufficient evidence to support the trial court's conclusion that S.J. was dependent and neglected within the meaning of subdivision 6(d) and 10(b) of the above statute,

which define dependency and neglect as situations where a child is without proper care due to the "emotional, mental or physical disability of the parent" or the "faults or habits of the parent". The trial court, however, found that "[S.J.] was sexually abused on more than one occasion by [the appellant]". This finding, if correct, would clearly support the court's determination that S.J. was dependent and neglected due to the "disabilities" and "faults or habits" of the appellant.

There is substantial evidence in the record which supports the trial court's determination that S.J. was sexually abused by the appellant. Although S.J. did make a few confusing and contradictory statements over a six-month period of therapy with Susan DeVries, her accusations overall were consistent. Evidence supporting the court's conclusion that the appellant sexually abused S.J. includes (1) testimony by S.J.'s foster mother regarding S.J.'s altered behavior after her visits with the appellant; (2) S.J.'s detailed and inappropriate knowledge about sex at such a young age; (3) S.J.'s actions when presented with anatomically correct dolls; and (4) opinions by experts that S.J. had experienced sexual abuse.

We therefore find that the trial court properly concluded that the appellant sexually abused S.J. It follows that the court's conclusion that S.J. was without proper care due to the appellant's disabilities and faults or habits was also proper.

Because we affirm the trial court's determination on the above grounds, we do not reach the appellant's alternate claims that S.J. was not dependent or neglected within the meaning of Minn.Stat. § 260.015 subd. 6(b) or subd. 10(e).

*2. Hearsay.*

The trial court allowed Patricia Batko to testify regarding statements made to her by S.J. during the course of her interviews in February 1983. Although counsel for the appellant objected to Batko's testimony as inadmissible hearsay, the court allowed it under Minn.R.Evid. 801(d)(1)(B) and 803(24). The appellant argues that this ruling was erroneous, and that the court should have disallowed Batko's testimony.

As the appellant himself admits, testimony by Susan DeVries covered the same ground as Batko's testimony and had the necessary circumstantial guarantees of trustworthiness. In light of this fact, we cannot find that the appellant was prejudiced by the admission of Batko's testimony, even if it was perhaps erroneously admitted. Where no prejudice has been demonstrated, the admission of evidence is within the trial court's discretion. *Thurman v. Pepsi-Cola Bottline Co.,* 289 N.W.2d 141, 145 (Minn.1980), *citing Busch v. Busch Construction, Inc.,* 262 N.W.2d 377, 387 (Minn.1977).

## DECISION

The record supports the trial court's determination that due to the appellant's sexual abuse, S.J. was a dependent and neglected child, and that, as a result, the appellant's visitation should be supervised.

Affirmed.