**The PEOPLE of the State of South Dakota In the Interest of P.B., a Child, Concerning K.B., Mother.**

No. 14793.

Supreme Court of South Dakota.

Considered on Briefs May 20, 1985.

Decided July 17, 1985.

Janice Godtland, Asst. Atty. Gen., Pierre, for appellee State; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Jean M. Cline of Finch & Viken, Rapid City, for appellant Mother.

WOLLMAN, Justice.

This is an appeal from an adjudication of dependency and neglect and a subsequent decree of disposition that terminated the parental rights of appellant, K.B., in her child, P.B. We affirm.*

Inasmuch as P.B. is entitled to be enrolled as a member of the Oglala Sioux Tribe, the State and the trial court complied with the provisions of the Indian Child Welfare Act. 25 U.S.C. 1901, et seq. The Tribe elected not to participate in these proceedings.

K.B., born March 16, 1967, first came to the attention of the Department of Social Services (Department) in 1974. In 1977 the parental rights of A.B., K.B.'s mother, were terminated with respect to K.B.

In October 1983, Department learned that K.B. was pregnant. It thereupon made attempts to place K.B. in a situation that would cause her to refrain from huffing (sniffing paint) and drinking. K.B. had been living with her mother, who apparently provided no control over these activities. In November 1983, Department placed K.B. in Threshold, a group home in Sioux Falls that provides services for adolescent girls.

The purpose of placing K.B. at Threshold was to help her make preparations for her baby by providing her prenatal classes, parenting classes, and prenatal medical attention. She was also provided support and information regarding alternatives to her pregnancy, which included her option to voluntarily terminate her parental rights with respect to her child.

P.B. was born on February 22, 1984. K.B., whose I.Q. is well below 100 (a social worker testified that it is closer to 63 than to 100) signed forms authorizing the placement of P.B. in a foster home. K.B. ultimately decided to keep the child, however, whereupon Department placed her and P.B. in a foster home in Rapid City on March 16, 1984.

A Department social worker established a case service plan for K.B. Under the plan, K.B. was encouraged to provide all of P.B.'s parenting needs under the supervision of the foster parents. In addition, a parent-aide was assigned to K.B. to help her with her budget and to encourage her to attend parenting classes. The social worker also provided K.B. with the telephone number of the positive parenting group, which provided the parenting classes, in case K.B. had any questions and was unable to contact the social worker or the parent-aide.

The social worker developed a basic child care chart for K.B., which included bathing, feeding, cleaning, laundry, and medical needs. K.B. was able to follow through on the tasks listed on the child care chart only by being reminded, encouraged, and prodded into doing so by the foster parent, the

---

* The putative father of P.B., who was ultimately served with a copy of the petition seeking an adjudication that P.B. was a dependent and neglected child, denied paternity of P.B. The trial court ruled from the bench that it was terminating the putative father's parental rights in P.B., although no findings, conclusions, and order to that effect appear in the record. In any event, the putative father is not a party to this appeal.

parent-aide, and the social worker. At times, K.B. did not want to go to the parenting classes.

K.B. became frustrated with the structure and expectations placed on her by the foster family, the social worker, and the parent-aide. She told the social worker that she was sick of living in foster care and of having people tell her what to do. Accordingly, K.B. decided to move out of the foster home and to return to her mother's home. Although the social worker did not agree with K.B.'s decision, there was nothing she could do about it inasmuch as K.B.'s participation in the foster care program was voluntary.

On May 28, 1984, the social worker developed a new case plan for K.B. Under this plan, a parent-aide would visit the home twice a week, a public health nurse would visit twice a week, and the social worker would make scheduled and unscheduled visits during the week. During a visit on May 31, the social worker found P.B. asleep, apparently clean and happy.

The social worker received several phone calls concerning P.B.'s residence on the morning of Monday, June 4, 1984. In addition, the landlord stopped by and informed the social worker that the police had been called to the residence three different times over the weekend to check on disturbances and on a fight. The police told the social worker that they had not seen the child during their calls to the residence.

At 3:00 p.m., June 4, the social worker and a police officer visited K.B.'s residence. The officer observed six or seven adults in the living room drinking and in various states of intoxication. The police officer testified that he smelled an odor of feces and urine in the house. When they asked to see K.B., the officer and the social worker were taken to a bedroom on the second floor of the residence, where they found K.B. lying on the bed with P.B. lying on her chest. K.B. was semi-conscious and had been vomiting on the floor near the bed. K.B. was so intoxicated that she was unable to walk without being assisted. P.B. appeared to be semi-lethargic. The social worker observed a white substance, which smelled and felt like paint, on P.B.'s arm. The social worker testified that she had known of situations in which a parent or an adult had placed paint on an area of the child's body that can reach the child's mouth and nose, thereby causing the child to become lethargic. This is done in an effort to quiet the child. K.B. testified that the white substance was toothpaste that she had been using to cleanse her (K.B.'s) mouth of vomit.

The social worker observed K.B. vomit on P.B. and then turn and vomit on the floor. K.B. told the social worker that P.B. had been in the home during the preceding weekend.

The police officer removed K.B. from the home and took her to the detoxification center.

Although P.B.'s clothing was not clean, it was adequate and her diapers were not wet or soiled. She was taken from the home by the social worker and the police officer and placed in the foster home, where she was undressed by the foster mother. The social worker observed a large bruise on P.B.'s buttocks, and a bruise on her hip. Also, there was a bruise on P.B.'s head. K.B. had indicated to the social worker that she had dropped P.B. on her head on June 2 while walking with her on the street.

During the first two days after being removed from K.B.'s home and being placed in the foster home, P.B. appeared to be very hungry and tired. She slept continuously except for the time when the social worker took her to the physician for an examination.

At the conclusion of the adjudicatory hearing, the trial court ruled from the bench that the state had proved beyond a reasonable doubt that P.B. was a dependent and neglected child as defined in SDCL 26–8–6. Formal findings of fact, conclusions of law, and an adjudicatory order were entered on September 21, 1984, *nunc pro tunc* August 17, 1984, the date of the adjudicatory hearing.

A dispositional hearing was held on October 5, 1984. It was established that after K.B. was released from the detoxification center she was not located by Department until July 18, 1984, when she was arrested and placed in detention. The social worker then set up bi-weekly visits between K.B. and P.B. Between July 18 and the date of the dispositional hearing, K.B. attended only five of those scheduled visits. The social worker described K.B.'s attitude during these visits as at first being extremely excited to see P.B., with appropriate questions regarding P.B.'s development. K.B. would then become frustrated to the point of crying herself when P.B. would begin to cry. The social worker testified that when K.B. came to these visits shortly after huffing, P.B. would become irritated by the smell of the chemicals on K.B. The social worker also testified that K.B. was unable to adequately care for herself inasmuch as she had not been eating properly. K.B. had told the social worker that on occasion she had eaten food that she had found in garbage receptacles and that she had slept on or under railroad cars.

K.B. was placed at Northern Hills Youth Services in Spearfish on August 9, 1984. This is a facility for teenagers with problems. The teenagers have access to counseling and become involved in community efforts. K.B. initially did fairly well in this program, but on August 19, 1984, she ran away from the facility and was jailed in Deadwood. On August 20, 1984, K.B. was placed in foster care. She remained in the foster home for one day and then left to return to her mother's home. On September 13, 1984, K.B. called her social worker from the detoxification center, saying that her mother had put her there because of her huffing.

K.B. failed to appear for her scheduled visits with her parent-aide on August 31 and September 7. As an example of K.B.'s low frustration threshold and her hostility, the social worker described an incident during which K.B. yelled and screamed at her over the eighteen dollars that K.B. had earned while she was at the Northern Hills Facility and which the social worker was holding for her. During this confrontation, K.B. told the social worker that she would terminate her rights to P.B. if the social worker would give her the money.

The social worker testified that she had become familiar with the child-rearing practices of American Indians and that she had had a good deal of experience in the delivery of child and family services to American Indians. She had also testified in other cases as an expert in dependency and neglect proceedings governed by the Indian Child Welfare Act. It was her opinion that K.B. lacks the ability to adequately provide for P.B. She expressed concern that P.B. would be placed in imminent danger because of K.B.'s inability to provide her a suitable environment and to provide for her medical, physical, and educational needs.

The evidence reveals that P.B. has special needs. She manifests one or two, but not all, of the traits of a child with fetal alcohol syndrome. She is also quite jittery and has manifested increased muscle tone and mild developmental delays. She needs an extremely stimulating environment to encourage her normal growth and development. In the opinion of the social worker, there has been no significant bonding between K.B. and P.B.

K.B. was evaluated by Ms. Yvonne Hagg, a clinical psychologist, on September 24, 1984. Ms. Hagg has had a good deal of experience in dependency and neglect cases involving Indian children and had testified as an expert in some twenty to thirty such cases prior to the dispositional hearing in this case. In Ms. Hagg's opinion, K.B. manifests the symptoms of a severe borderline personality disorder, which Ms. Hagg testified is characterized by

impulsive behavior, instability in many areas, including behavior affect and relationships often in the history of self-destructive acting out, such as suicide attempts or multilation, or instability in terms of mood swings, labile affect, inappropriate anger and frequently drug abuse.

Ms. Hagg testified regarding her observation of the abrupt changes in K.B.'s emotional state. K.B. had manifested a great

deal of ambivalence, which refers to an intense, conflicting emotional state that exists simultaneously or in rapid succession. Ms. Hagg testified that K.B.'s severe borderline personality disorder would almost certainly affect her ability to parent a small child. K.B. had told her that she uses whatever chemical she can get her hands on. K.B. acknowledged that she had huffed paint and gasoline for at least three years and that she had also used hallucinogens, PCP, stimulants, and depressants. Ms. Hagg testified that there is a possibility that K.B. is suffering from an organic mental disorder as a result of the prolonged ingestion of chemicals such as paint and gasoline.

Ms. Hagg also testified that K.B. had described at least five attempts to take her own life, ranging from slashing her wrists to attempting to hang herself.

It was Ms. Hagg's opinion that there was a high probability that P.B. would suffer severe physical or emotional harm if she were to be returned to K.B.'s custody. She testified that K.B. could not properly care for a young child, and that even with appropriate intervention there was no assurance that K.B. would be able to provide proper care within a period of two years. Ms. Hagg recommended that K.B. be sent to a treatment facility such as the South Dakota Human Services Center. She testified that the prognosis for persons with K.B.'s personality disorder, as complicated by limited intellectual ability and poly drug abuse, is very poor.

At the time of the dispositional hearing, K.B. was in the detoxification center undergoing a program for persons with alcohol or chemical dependencies.

Although P.B. has raised some six separate legal issues, we conclude that they can be adequately discussed under two general headings.

### I.

*Whether the Trial Court Erred in Finding that P.B. Was a Dependent and Neglected Child.*

■ Under the Indian Child Welfare Act, the State must prove dependency and ne-glect by clear and convincing evidence. *People in Interest of S.R.*, 323 N.W.2d 885 (S.D.1982). The trial court elected in the instant case, however, to apply a beyond-a-reasonable-doubt standard.

■ The trial court found that P.B. lacked proper parental care through the actions or omissions of K.B. SDCL 26-8-6(2). In attacking this finding as being clearly erroneous, K.B. argues that it was Department's fault that K.B. ended up in the situation which resulted in her being found in an intoxicated condition in her mother's home on June 4, 1984. Indeed, K.B. charges that "[t]he evidence clearly shows that the department of social services placed appellant in a situation guaranteed to permit them to walk in and claim harm to the child." We conclude that this attack on Department's actions is unwarranted and unjustified. In the light of K.B.'s demonstrated lack of emotional stability and immaturity, Department attempted to assist her in learning parenting skills even before P.B. was born. Thereafter, Department continued with this program of assistance, only to have K.B. spurn it in favor of returning to the environment that ultimately necessitated further intervention by Department.

We hold that the trial court's finding that P.B. was a dependent and neglected child is more than adequately supported by the evidence, and is thus not clearly erroneous. *See, e.g., Matter of S.H.*, 337 N.W.2d 179 (S.D.1983); *People in Interest of P.M.*, 299 N.W.2d 803 (S.D.1980); *People in Interest of D.K.*, 245 N.W.2d 644 (S.D.1976). Given the situation in which Department found P.B. on June 4, 1984, any other finding by the trial court would have been unthinkable.

### II.

*Whether the Evidence Was Sufficient to Support the Trial Court's Order Terminating K.B.'s Parental Rights.*

The Indian Child Welfare Act provides in part:

No termination of parental rights may be ordered in such proceedings in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C.A. § 1912(f).

K.B. contends that the evidence submitted at the dispositional hearing fails to show beyond a reasonable doubt that K.B.'s continued custody is likely to result in serious emotional or physical damage to P.B. We do not agree.

■ Suffice it to say that K.B. is simply incapable of providing the type of environment necessary to meet P.B.'s developmental needs. Granted that it is not within K.B.'s power to improve her intellectual capacity (who of us by taking thought can add one cubit to our height?), but her parental rights are not being terminated because of her less-than-average intelligence. It is K.B.'s chronic use of alcohol and inhalants, coupled with her severe borderline personality disorder, that makes the danger of serious emotional or physical harm to P.B. not only likely but inevitable. A mother cannot provide an adequately nuturing environment for a young child when the mother herself is in need of intensive, long-term treatment and therapy. It is to be hoped that K.B. will profit from such treatment and therapy, but hope for her improvement is not an adequate substitute for the guarantee of P.B.'s safety.

■ K.B. also contends that Department failed to make active efforts to provide medical services and rehabilitative programs to prevent the break-up of this family, citing that portion of the Indian Child Welfare Act which provides:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C.A. § 1912(d). Again, we do not agree. True, the State must prove beyond a reasonable doubt that it has complied with this requirement of the Act. *People in Interest of S.R., supra.* From what we have outlined above, however, it is clear that Department has satisfied this burden. It attempted to educate K.B. in the rudiments of child-caring techniques even before P.B.'s birth. Department continued these efforts after P.B.'s birth, only to have K.B. spurn them by returning to the deleterious environment of her mother's home, from which Department had tried to insulate her. After P.B.'s removal from that environment, Department persisted in its efforts to assist K.B. in developing her maternal skills and to overcome her alcohol and chemical addictions, to no avail. K.B. is not responsible for her less than average intelligence or her psychological impoverishment, but neither is Department charged with the duty of persisting in efforts that can only be destined for failure.

Finally, K.B. contends that the trial court erred in finding that termination of her parental rights was the least restrictive alternative, again charging Department with failing to provide sufficient assistance to her in the way of providing housing and parenting skills.

■ Parents have a fundamental liberty interest in the care, custody, and management of their children. *See, e.g., People in Interest of S.L.H.,* 342 N.W.2d 672 (S.D.1983). This fundamental interest is neither absolute nor unconditional. *Id.; In re N.J.W.,* 273 N.W.2d 134 (S.D.1978); *In re K.D.E.,* 87 S.D. 501, 210 N.W.2d 907 (1973).

The best interest of the child is the paramount consideration in determining whether to terminate parental rights. SDCL 26–8–36; *see, e.g., People in Interest of S.L.H., supra; In re M.S.M.,* 320 N.W.2d 795 (S.D.1982).

■ In entering a dispositional order, the trial court must apply the least restrictive alternative. *See, e.g., People in Interest of S.L.H., supra; In re S.H., supra, In re N.J.W., supra.*

■ The least restrictive alternative test means just that, for not every conceivable form of assistance must be attempted and found wanting before termination of parental rights is justified.

Termination of parental rights is not conditioned on exhaustion of every possible form of assistance.... In the event counseling and therapy fail to improve parenting skills, termination of parental rights is justified.... Social Services cannot implement its plans and programs without the client's participation and co-operation.... When all Social Services attempts and assistance fail for lack of cooperation, no narrower or less restrictive alternative remains.

*Matter of D.H.,* 354 N.W.2d 185, 191 (S.D. 1984). *See also In re J.S.N.,* 371 N.W.2d 361 (S.D.1985); *In re A.L.P.,* 368 N.W.2d 617 (S.D.1985); *People in Interest of C.L.,* 356 N.W.2d 476 (S.D.1984).

■ Also, it must be remembered that the least restrictive alternative is viewed from the child's perspective. *In re J.S.N., supra; People in Interest of C.L., supra.*

As we' held in *J.S.N., supra,* "The best interests of children require that some certitude and stability enter their lives." 371 N.W.2d at 364. *See also In Matter of S.S.,* 334 N.W.2d 59 (S.D.1983).

■ When viewed in the light of the foregoing principles, the evidence presented to the trial court fully justified its decision to terminate K.B.'s parental rights. Granted, the conditions that resulted in the adjudication of dependency and neglect had not existed for a lengthy period, but those conditions would only have continued or worsened, notwithstanding Department's best efforts. Accordingly, the trial court did not err in entering the order terminating K.B.'s parental rights.

The order of adjudication and the dispositional order are affirmed.

All the Justices concur.

WUEST, Circuit Judge, Acting as Supreme Court Justice, participating.