386 N.W.2d 495 (1986)
The PEOPLE of the State of South Dakota In the Interest of H.L., JR. and B.L., Minor Children, and Concerning K.M.L., H.L., Sr. and the Department of Social Services.
No. 14973.
Supreme Court of South Dakota.
Considered on Briefs January 16, 1986.
Decided April 30, 1986.
Janice Godtland, Asst. Atty. Gen., Pierre, for State; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.
Kenn Pugh, Public Defender, Deadwood, for minor children, H.L., Jr. and B.L.
Reed C. Richards, Deadwood, for appellant, K.M.L.
John J. Delaney, Lead, for H.L., Sr.
WUEST, Justice.
This is an appeal from an adjudication of dependency and neglect, and an order of disposition changing custody of H.L., Jr. and B.L. from their mother to their father. We affirm.
K.M.L. (mother) and H.L., Sr. (father) were divorced on July 18, 1983. They had two sons, H.L., Jr., now ten years old, and B.L., now seven. Mother was awarded custody of the children subject to the father's visitation rights. On June 29, 1984, at approximately 12:00 p.m., Lawrence County Deputy Sheriff Nels Juso (Juso) went to mother's home in response to a report that H.L., Jr. and B.L. may have *496 been abused by their mother. Juso advised mother the boys would have to be placed in temporary custody, although she claimed she had merely spanked them for misbehaving. Juso testified at the adjudicatory hearing that he discussed the matter with H.L., Jr., while driving the children to the Lawrence County Sheriff's Office, and that H.L., Jr. told him his mother often spanked him with a fly swatter. The child said he was spanked and locked in the basement that morning for fighting with his brother, but he located the key, unlocked the door, and went to a neighbor's house. He said his mother spanked him again when he returned home.
Juso and the two boys were met at the sheriff's office by father. Juso told him H.L., Jr. complained of being spanked with a fly swatter, and father requested an examination for welts and bruises. The examination revealed welts on H.L., Jr.'s lower back, right buttock and lower right thigh, as shown by two photographs received in evidence. The boys were then taken to a medical center and examined by a physician who prescribed medicine for an infection of B.L.'s posterior.
Father testified he was summoned to the sheriff's office by the Department of Social Services (Social Services), and that when the children arrived they were very dirty and smelled. The boys told him they had not bathed in a week as there was no fuel to heat the water in mother's home. Father further testified that when he took the children on a previous weekend they were dirty. He said he regularly exercised his visitation rights, and on seven occasions between May 1983 and June 1984, mother was not home when he returned the children. Father related an instance in November 1983 when mother informed him, upon his arrival to pick up the boys for visitation, that she would like him to keep them for awhile. He explained he had to work the following Monday, and she responded: Well, too bad. I won't be there." Father tried to return the children on Sunday evening, but mother was not at home. He drove to the house three more times, finally contacting the mother at 6:30 Monday morning, and was told to leave the boys with her neighbor, "Bones," a twenty-seven-year-old male who lives with his parents. Father was finally able to return the children on Tuesday.
Father testified that on March 11, 1984, he tried to return the children after a weekend visit. Mother was not home at 5:30 p.m., nor at 7:30 p.m., but called his residence at 9:30 p.m. and asked that he return the boys. When he arrived with H.L., Jr. and B.L., he was met by the mother's boyfriend, Gary Seidel (Seidel), who lives with her and the children. Father said Seidel could barely walk, tripped and fell, weaved back and forth, slurred his speech and smelled strongly of alcohol. Mother admitted both she and Seidel had been drinking, but denied they were drunk. Father testified that on three other occasions, mother had been drinking when he returned the children.
In the fall of 1983, father consulted Lora Hawkins, a supervisor with Social Services, and apprised her of certain matters concerning his sons. The children rode the school bus and their father learned that on occasion the bus driver returned them to school because no one was at their home and they were not appropriately dressed for the weather. In December 1983, father was notified by the school nurse that B.L. had been badly bitten on the ear by the neighbor's dog. The neighbor could not reach the mother and sent the child home on a school bus. The bus driver, however, returned B.L. to school and the nurse determined the boy should see a physician. An appointment was made and the doctor found the severity of the wound warranted stitches.
On June 4, 1984, father was informed that B.L. had been taken to the local hospital because of a high fever, which was diagnosed as a symptom of influenza. When father arrived at the hospital, he was asked to care for B.L. because mother had been drinking. H.L. Jr. spent that night with a friend of mother's, apparently because her boyfriend, Seidel, had beaten her *497 and she was temporarily unable to care for the child. Mother explained that she and Seidel began drinking that afternoon. Later, she and her neighbor, "Bones," took B.L. to the hospital. From there they went to a bar and stayed for an hour. When she returned home, Seidel asked if supper was ready. The dog had eaten the food prepared and, upon learning this, Seidel began hitting and kicking her. She stated that he threw a microwave oven out the door, grabbed her by the hair and dragged her. He ripped her shirt off and pushed her against a wall, at which time she ran to the bedroom, found another shirt and ran out the door. Mother said she drove to the doctor because she was dizzy and hurt, and spent the night in the hospital.
Mother testified that Seidel talked with Bob Raymond (Raymond) of West River Mental Health after the incident. Raymond suggested that Seidel receive counseling; mother, however, did not feel it was necessary. Seidel testified that he did not receive counseling after he beat mother. Mother stated that she and Seidel planned to get married.
Susan Walsh (Walsh), a social worker with Social Services, was assigned to the case and met mother on July 3, 1984. Mother admitted spanking H.L., Jr. with a fly swatter, explaining she had been very upset with his behavior and spanked him too hard. Mother told Walsh she spanked as a last resort and used a fly swatter when this was done. Mother agreed to receive counseling from West River Mental Health.
On August 9, 1984, Walsh visited the children alone. H.L., Jr. told her his mother spanked him often, at least twice a week with a fly swatter. He said his father also spanked him, but did not hit as hard as his mother. Walsh said H.L., Jr. wanted to live with his father. He indicated that his mother and Seidel drank a lot and his father did not. B.L. indicated he wanted to live with his mother if she would be as nice as she was when the social workers were there.
On August 23, 1984, Dr. Robert Arnio (Dr. Arnio), a psychologist, evaluated the two boys. Father informed the psychologist that B.L. had received numerous medical examinations, and the physician had requested counseling for gastrointestinal problems. There was no definitive medical diagnosis, and the problem lessened when the child was with his father. Father also reported that H.L., Jr. had problems paying attention at school, and had seen the school counselor. H.L., Jr. told Dr. Arnio that his mother used more physical discipline than his father, and that his father spanked him four times during weekend visits, while his mother spanked him over one hundred times. Dr. Arnio stated that it was unusual for a child to quantify such things in that magnitude. H.L., Jr. also indicated his mother yelled more and used more verbal intimidation. The child related the incident in which he was locked in the basement while his mother and brother went to town. Dr. Arnio said the episode appeared to bother the boy very much, and he indicated he wanted to live with his father. Dr. Arnio noted that B.L. appeared more anxious than the older child throughout the interview, and was more hesitant to talk. B.L. also stated he wanted to live with his father but would not say why. The psychologist had the child do some drawings, and said they showed a lot of anxiety. B.L. wet his pants while drawing, but did not indicate that he needed to use the bathroom.
Dr. Arnio testified the anxiety he observed in B.L. was consistent with the medical problems reported by the father, and that stomach aches were symptomatic of such anxiety. He continued, noting that extensive corporal punishment can have detrimental effects on children, often producing a general sense of anxiety and a good deal of aggressive behavior, as well as a lot of frustration. Dr. Arnio stated the behavior of H.L., Jr. and B.L. was consistent with the behavior of children from deprived environments.
After the incident on June 29, 1984, the boys were placed with their father, which resulted in their changing attendance from *498 the Lead-Deadwood School to the Sturgis School. Walsh spoke with teachers who indicated that both boys improved academically and behaviorally over the previous school year. H.L., Jr. had prior problems with fighting on the playground and B.L. had been withdrawn in class. Walsh stated that father provided a more structured environment for the children than mother, and had more definite rules and expectations for them. Father and his new wife reported some disciplinary problems with the children. Both adults, however, completed parenting classes and tried to employ the concepts in the discipline of the children. Walsh recommended that father be granted physical custody of the boys with mother taking them in the summer. She also recommended that the noncustodial parent be allowed visitation on alternative weekends, alternate holidays, and two weeks in the summer. H.L., Jr. told Walsh he was tired of being asked about custody. He loved both parents. When he was with mother, he told her he wanted to be with her, and when he was with his father, he told him he wanted to be with him. Apparently, the child was concerned about hurting either parent's feelings.
Raymond counseled mother on occasion since November 1980. Although he believed mother had punished H.L., Jr. excessively, he did not think mother had a long-standing pattern of abuse. Raymond stated that mother was willing to receive counseling. He did not, however, receive any commitment from Seidel to accept counseling. Raymond felt that any time there was physical violence in a home there was a potential for recurrence. Raymond concluded, however, that mother was fit and capable of resuming custody of her children, and that her home would not be injurious to their welfare. He also concluded that the children received positive parenting from father and his wife and that they functioned well in that environment. Raymond stated that father and his new wife were competent and responsible and had done a good job with the children.
Mother appeals from the adjudication of dependency and neglect, urging this court to reverse the trial court because several out-of-court statements were admitted into evidence. Specifically, mother contends that statements H.L., Jr. made to his father and Deputy Juso concerning being spanked with a fly swatter and being locked in the basement were hearsay and inadmissible under any recognized exceptions. We disagree.
Although SDCL 26-8-30[*] provides that adjudicatory hearings be conducted in a court with the applicable rules of civil procedure, to prevail, mother must not only prove error, she must establish that a different result would probably obtain in the absence of the claimed error. Matter of S.L., 349 N.W.2d 428 (S.D.1984); Dwyer v. Christensen, 77 S.D. 381, 92 N.W.2d 199 (1958). We believe mother's contention fails in both respects.
First, we note that H.L., Jr.'s statements were made while he was en route to and at the sheriff's office following the events in question. In State v. McCafferty, 356 N.W.2d 159 (S.D.1984), we held the response of a seven-year-old to a teacher's inquiry about a red mark on the child's neck was properly admitted as a timely and somewhat spontaneous statement. The statement was allowed under the excited utterance exception to the rule against hearsay, SDCL 19-16-6. The statements in the instant case are more timely than the child's statement in McCafferty. Indeed, both the deputy sheriff and father noted that H.L., Jr. was still visibly upset from the incident which occurred just a few hours earlier. Furthermore, as we noted in McCafferty, 356 N.W.2d at 161:
SDCL 19-16-5 or -6 is nearly verbatim with Rule 803(1) or (2) of the federal rules respectively. Under the federal rules, many courts have relaxed the rigid time and spontaneity requirements when *499 the declarant is a child of tender years. 7 J.JUV.L. 205 (1983).
In State v. Bult, 351 N.W.2d 731 (S.D. 1984), we acknowledged the fact that the excited utterance exception embodied in SDCL 19-16-6 was initially deduced by Wigmore from his analysis of res gestae cases, stating:
Therefore, it is not surprising to find that prior to our adoption of the federal rules this court stated in State v. Percy, 80 S.D. 1, 7, 117 N.W.2d 99, 102 (1962): While the time that elapsed between the event and the statement is a factor to be considered, it is not determinative. Whether an utterance was made under the influence of the event must be determined on the basis of the circumstances in each case. The admissibility of such statements is in the sound discretion of the trial court and we will disturb his holding only if convinced that such discretion was abused.
We conclude, therefore, the trial court did not abuse its discretion by admitting the statements made to the father and the deputy sheriff.
Mother also argues that the trial court's findings in the dependency and neglect hearing were not supported by the evidence. The often-quoted standard for our assessment of such contentions in these cases is that the trial court's findings will not be overturned unless we find them clearly erroneous. SDCL 15-6-52(a). See also In Re A.M., 292 N.W.2d 103 (S.D. 1982). Moreover, the trial court's rulings are presumed correct and this court will not seek to reverse. If the record contains evidence to support the decision, we will not disturb the lower court's findings of fact, nor will we decide the factual issues de novo. In Re D.H., 354 N.W.2d 185 (S.D.1984).
Upon a review of the record in this case, and the facts as set out heretofore in this opinion, we are unconvinced that the trial court's findings of fact in the dependency and neglect hearing were clearly erroneous and the trial court is affirmed on this issue.
Finally, mother argues that the trial court's findings in the dispositional hearing are not supported by the evidence. Again, the standard for review is the clearly erroneous standard. After the hearing, the trial court found that the State had "established by clear and convincing evidence that it is in the best interests of the minor children herein that legal and physical custody of H.L., Jr. and B.L. be placed with father. Mother contends that she and Seidel were not offered rehabilitative services to improve their parenting abilities. The record, however, admits the contrary. Walsh recommended that mother attend parenting classes and that she seek counseling. Walsh further recommended that Seidel, whom mother planned to marry, also seek counseling and attend parenting classes. The couple did not follow through with these suggested services. Mother attended one parenting class and dropped out, while Seidel attended no classes. Although mother told Walsh that Seidel attended counseling sessions with Raymond on occasion, Raymond testified that he never saw Seidel for counseling.
In a dispositional hearing, the trial court must apply the least restrictive alternative. People in Interest of S.L.H., 342 N.W.2d 672 (S.D.1983). This standard is examined from the child's point of view and not the parents', as the prime concern of the court is the child. In Re C.L. and B.R., 356 N.W.2d 476 (S.D.1984); In Re R.Z.F., 284 N.W.2d 879 (S.D.1979). Given the facts in this case, the violence that precipitated this disposition, the alcohol abuse, and the domestic unrest between mother and Seidel, we believe the court was correct in determining that a change in custody from mother to father was the least restrictive alternative available for the welfare of the children.
Accordingly, the trial court is affirmed.
All the Justices concur.
SABERS, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.
NOTES
[*] Also see Matter of C.J.H., 371 N.W.2d 345 (S.D. 1985); People in Interest of C.L., 356 N.W.2d 476 (S.D.1984).