397 N.W.2d 81 (1986)
In the Matter of the Dependency and Neglect of C.L. and R.P., and Concerning Their Parents, D.L.P. and C.P.
Nos. 15185, 15186.
Supreme Court of South Dakota.
Considered on Briefs September 15, 1986.
Decided November 26, 1986.
*82 Dale A. Wein of McNeary & Moen, Aberdeen, for appellants D.L.P. and C.P.
Jeffrey T. Sveen of Siegel, Barnett & Schutz, Aberdeen, for appellees C.L. and R.P.
Julie T. Lovrien, Deputy State's Atty., Aberdeen, Janice Godtland, Asst. Atty. Gen., Dept. of Social Services, Pierre, for appellee State.
WUEST, Chief Justice.
This is an appeal by the parents from disposition orders of the trial court terminating the parental rights of D.L.P. (Mother) and C.P. (Father) to C.L. and R.P. (children). We affirm.
An adjudicatory hearing was held for both of these children and both were found to be dependent and neglected children. After a dispositional hearing for both, the trial court entered an order terminating the parental rights of the parents. (C.P. is the father of R.P. but not C.L.). This Court heard an appeal from this mother in another termination case when her parental rights were terminated to an infant daughter in 1984. Matter of A.L.P., 368 N.W.2d 617 (S.D.1985).
Mother testified that C.L., was abused physically by her father (Grandfather), her brother and her ex-husband, and was sexually abused by a retarded uncle, who resided in Grandfather's home. She agreed that it would be unsafe to ever allow C.L. to live in or visit there unless D.L.P. was present at all times. Nevertheless, visits to the home by C.L. continued to be unsupervised by Mother. In early January, 1985, Mother and her son moved into her parents' home.
Officials from the Welfare Department visited Mother at the home and offered to help her find employment and independent living away from the home, but Department was refused on four occasions. Out of concern for C.L., about six years old, he was interviewed at school. He was then removed from the home on January 18, 1985.
When C.L. was first transferred to temporary foster care, he was unclean, had dirty matted hair, and disagreeable body odor. His clothing was soiled, torn, and over-sized. He often soiled his pants and would urinate on floors and walls when distraught. He did not know how to wipe his nose or how to wipe after a bowel movement. He did not know how to eat properly at the table with eating utensils and did not know what a bar of soap was meant for. C.L. also exhibited violent behavior problems and socially delayed behavior.
Two social workers with the Department testified at C.L.'s adjudicatory and dispositional hearings that when shown anatomically correct male dolls, C.L. immediately removed the clothes from the smaller doll and pulled down the pants on the larger doll. He was surprised that they were sexually accurate. He named the small doll "C" and the large doll "uncle H." He placed them side by side on their backs and placed the man doll's hand on the small doll's penis while also placing the small doll's hand on the man doll's penis. He moved the hands up and down on the dolls' penises. Both Mother and Grandfather had indicated that the uncle, who is retarded, had to be watched closely. Uncle H had been caught with C.L. in the bathroom masterbating. C.L. indicated these things had occurred often.
After the removal of C.L. from his mother, efforts were begun to get the family reunited. Due to the sexual abuse, Mother was told she would have to establish independent living away from her parents. In May, 1985, Mother moved into an apartment in Aberdeen with the assistance of the Department, and Brown County paid the first month's rent. Father was released from jail at this time after serving a sentence for DWI. The second month's rent was not paid, however, and the couple was evicted. Mother's tax refund check had been spent on a television and a stereo. Neither parent was employed. The couple's only income was food stamps.
The couple received classes on getting into the job market three times a week. *83 Some classes lasted up to two hours. The counseling covered personal hygiene, self esteem and job skills. Father was offered vocational rehabilitation which he refused.
The couple was exhibiting no motivation to accept the help being offered. Their personal hygiene had not improved and they were missing appointments without explanation. After six weeks the parents informed the program director that they had temporarily lost custody of their three-week-old son, R.P., after an episode of domestic violence and child abuse. The couple showed no remorse over losing the baby.
The couple was physically violent on almost a daily basis, and they were separated twice during a three month period. Child protection counselors worked with the couple to deal with the continued physical violence but with little success. The violent episodes continued in spite of the help. The couple would even break into arguments while at counseling sessions in the presence of C.L. and the counselor. Alcohol treatment had no impact on Father, but there was some improvement by Mother. Nevertheless, the violence continued, and Mother was still the one who often initiated the physical hitting. Testimony indicated the violence was learned behavior and would require an extended period of time to control.
Despite a great deal of time spent in the home and visits with the children, attempts to improve parenting skills were also a failure. Parents failed to practice what had been taught them. Acceptable improvement was projected to be one to three years away.
In a portion of the dispositional order for C.L., the trial court summarized the frustrated attempts made at getting this family back together.
These people have been offered every available resource in this community. This has actually been going on with this family since August of 1983 when the first problems with the family were reported regarding the abuse of their infant daughter A.L.P. During that period they received the services of the Intensive Prevention Placement Program where a worker was assigned to spend a great deal of time in the home with the family and give extensive aid in handling all family and child rearing problems. Eventually that program failed and the infant A.L.P. was permanently removed from the family. There has actually been a period of close to two years of working and providing services to this family and still they are in their same old path of fighting both physically and verbally, making no effort to work and support themselves or their children. The violence in the home continues on almost a daily basis. There have been no substantial progress in the field of good parenting or temper control. The possibility of improving to a minimum standard of parenting would take at least one and a half years and this would only be if the motivation was there. After two years of giving assistance to this family the only improvements are very minimum. Clinton could not possibly be returned to his parents at this time without losing all of the gains that have been made toward bringing him to the stage of being a normal child. Further waiting for these parents to straighten themselves out is not a feasible solution.
A similar finding was made as to R.P. The baby had been subjected to mistreatment in the same pattern as had A.L.P. During violent fights, Mother threatened and abused the child to get at her husband. R.P. also had serious physical and medical problems which placed him in a high risk category for physical abuse. It was shown that special needs children are more apt to be abused since an irritable baby places more demands on the parents and requires higher than average parenting skills. R.P. did not receive even basic parental protection and care. The parents were not capable of providing average care and would not be able to for some time. Further, R.P. had serious medical problems and increased care requirements which could not be provided by Mother and Father even if *84 they eventually could perform at average parental levels.
On appeal, the parents contend that the trial court erred when it allowed the testimony of the social workers which described C.L.'s behavior with the anatomically correct dolls. The parents argue that C.L.'s play-acting constituted nonverbal conduct intended as an assertion and thus became nonverbal hearsay statements offered to prove the sexual abuse of C.L. The trial court allowed the social workers' testimony as to the nonverbal conduct by C.L., but the court did not rule whether the play-acting was admissible as nonhearsay or whether it was hearsay admissible under a hearsay exception.
Hearsay testimony is not admissible in adjudicatory hearings unless it falls within one of the recognized exceptions. People In Interest of M.W., 374 N.W.2d 889 (S.D. 1985). Evidence concerning C.L.'s playing with the dolls was presented in the adjudicatory hearing and not in the dispositional hearing alone, so the hearsay rules will apply. In the Matter of C.J.H., 371 N.W.2d 345 (S.D.1985). Hearsay includes nonverbal conduct if it is intended as an assertion. SDCL 19-16-1; State v. Bawdon, 386 N.W.2d 484 (S.D.1986).
The state argues that the conduct, if hearsay, is admissible under the residual hearsay exception of SDCL 19-16-35. However, a statement admitted under the residual exception to the hearsay rule may be admitted only after the declarant is deemed unavailable as a witness. SDCL 19-16-35; People In Interest of M.W., supra; State v. McCafferty, 356 N.W.2d 159 (S.D.1984). Although C.L. was six years old and socially delayed, there was no determination by Judge Ramynke that he would be unable to testify meaningfully. The other elements of the exception may have existed, but the initial test of unavailability was not met.
South Dakota has a "tender years" exception to the hearsay rule in SDCL 19-16-38. The statute allows otherwise inadmissible statements by a child under the age of ten which describes any act of sexual abuse. Such a statute is critical to the need for these statements, and it addresses the various reliability problems posed by the statements. It is superior in sexual abuse cases to both the spontaneous exclamation exception and the residual exception approach. Yun, A Comprehensive Approach to Child Hearsay Statements In Sex Abuse Cases, 83 COLUM.L.REV. 1745 (1983). However, our statute applies only in criminal proceedings, and dependency and neglect proceedings are civil in nature. SDCL 19-16-38; Interest of M.W., supra; Matter of C.J.H., supra.
It is notable that the legislature has not amended SDCL 19-16-30 to apply to dependency proceedings. Reasoning would support an amendment that would allow this hearsay exception in civil proceedings. Several states have so amended their statutes. See Wash.Rev.Code Ann. § 9A.44.120 (1985 Supp.); Colo.Rev.Stat. § 13-25-129 (1984 Supp.); Utah Code Ann. § 76-5-411 (1983 Supp.); Ariz.Rev.Stat.Ann. § 13-1416 (1984 Supp.); Kan.Stat.Ann. § 60-460(dd) (1984 Supp.); 12 Okla.Stat. § 2803.1 (1984 Supp.). As with SDCL 19-16-35, there is a requirement for nonavailability under SDCL 19-16-38 as well. Thus, even if the tender years exception would have been applicable in these proceedings, again a major precondition would not have been determined by the trial court.
In the case In re Dependency of Penelope B., 104 Wash.2d 643, 709 P.2d 1185 (1985), the Washington Supreme Court was faced with a statute identical to SDCL 19-16-38 in that their tender years statute had been amended to include dependency proceedings only after the trial court had decided its case. However, due to the nature of the child's nonverbal conduct with the anatomically correct dolls, the Washington Supreme Court was able to determine that much of what the child did was not hearsay.
Despite the hearsay rules as they exist in South Dakota, C.L.'s play-acting with the dolls, absent all verbal assertions properly excluded by the trial court, was *85 not intended by him as an assertion and therefore was not a hearsay statement. The test is whether or not it was intended as an assertion. The spontaneous reaction of C.L. to the dolls and his actions with them are circumstantial proof of his being subjected to sexual abuse. The admissibility of nonassertive verbal or nonverbal conduct as circumstantial evidence of a fact in issue is governed by the principles of relevance, not by hearsay principles. In re Penelope, supra.
A young child is unlikely to fabricate a graphic account of sexual activity because such activity is beyond the realm of his or her experience. McCafferty, supra. "An assertion that is circumstantial evidence proves a fact indirectly, by implication; credibility of the declarant is not important because the relevance of the assertion does not depend on its truth." In re Penelope, supra. When evidence is offered on the theory that it is not a nonverbal assertion, the burden is on the party claiming that an assertion is intended; doubtful cases are to be resolved against that party and in favor of admissibility. In re Penelope, supra.
Even if the conduct alone was assertive, which we do not believe it was, any error in the court's admitting the evidence was harmless error. First, Mother herself stated in the hearing concerning A.L.P. that her son C.L. had been sexually abused by her uncle and that the entire family, including Grandfather, was aware of it. Grandfather testified to suspected incidents. In light of these facts, we find that the admission of the social workers' statements, even if erroneously admitted, were not prejudicial when other evidence existed that proved sexual abuse of C.L. The parents have not demonstrated prejudice or for that matter maintained that it even existed. See, Interest of M.W., supra; Matter of Welfare of S.J., 367 N.W.2d 651 (Minn.App.1985).
Second, even if all evidence concerning the sexual abuse were ignored, all of the other factors of dependency and neglect seen in this case would sustain the trial court's decision.
Parent's second point on appeal is that termination of parental rights was not the least restrictive alternative available to the trial court. However, parents have not indicated what the trial court should have done while waiting for the parents to make some improvement. Nor did the parents provide any evidence as to how long before they expected that they could assume parental duties.
The trial court was keenly aware of the efforts made on the family's behalf in 1983 and 1984. Two years of services had proven ineffective. Services were also rendered through most of the year 1985. The services were extensive and dealt with every aspect of the parent's problems.
Dr. Betty Robertson felt the parents could possibly provide average care to their children in one and one-half years. However, this depended on the parent's motivation, cooperation, and progress in all of their problem areas, including their unstable marriage, violent lifestyle, alcoholism, and economic problems. She felt three years was more realistic. Even then, there was question whether they could ever reach a higher level of care that the special needs of the children required.
In a dispositional hearing, the trial court must apply the least restrictive alternative. People In Interest of H.L., J.R., 386 N.W.2d 495 (S.D.1986); People In Interest of P.B., 371 N.W.2d 366 (S.D.1985). This standard is examined from the child's point of view. Interest of H.L., J.R., supra; Matter of S.M., 384 N.W.2d 670 (S.D. 1986); Interest of P.B., supra. The trial court must find by clear and convincing evidence that termination of parental rights is in the child's best interest. Matter of S.M., supra. "The best interests of the children require that some certitude and stability enter their lives." People In Interest of J.S.N., 371 N.W.2d 361 (S.D.1985); Interest of P.B., supra.
The trial court balanced the interest of children, parents and society. It clearly appears from the trial court's memorandum *86 decisions that all resources available to this family were used but failed to make responsible nonviolent parents of them. Where efforts are made to help the family through social services, but such help is unavailable, there is no remaining less restrictive alternative than to terminate the parental rights of the parents. Matter of S.M., supra; Interest of P.B., supra; Interest of J.S.N., supra; Matter of A.L.P., supra.
Parent's third point on appeal is that their constitutional due process right to "fundamental fairness" was violated because information concerning in-family violence that was communicated by them to social workers was later used against the parents. Parents argue that the failure of a parent to cooperate with social workers in advance of dispositional hearings cannot be admitted in a dispositional hearing. In The Matter of D.H., 354 N.W.2d 185 (S.D. 1984). Therefore, it is "unfair" that the parents' statements to social workers may be used in evidence against them.
Parents cite U.S. ex rel. Mishkin v. Thomas, 282 F.Supp. 729 (D.C.N.Y.1968) for the proposition that the due process concept stems from the idea of fairness. That case involved a search and seizure in a criminal case. In the present case we have a civil case where the information was volunteered by the parents. We do not find any departure from state law or the removal of any due process protection by the state's use of evidence which the parents volunteered in their efforts to receive the help and assistance of social services. Nor do we see anything "fundamentally unfair" with the examination of the evidence volunteered by the parents in this case when prior court records and independent testimony concerning bruises and facial wounds clearly indicated the level and duration of violence in the home.
Parents also cite Sigma Chi Fraternity v. Regents of the University of Colo., 258 F.Supp. 515 (D.C.Colo.1966) for the proposition that whether a party has received procedural due process is one of fundamental fairness. We do not find any argument which claims that the parents did not receive procedural due process. The case cited by the parents explains that due process "does not guarantee any particular mode of procedure but that it does require adequate notice of opposing claims, reasonable opportunity to prepare and meet them in an orderly hearing adopted to the nature of the case and finally, a fair and impartial decision." Sigma Chi, supra, at 528.
Parents have not alleged that procedural due process requirements were lacking in the hearings.
The procedural due process requirements in parental rights termination hearings have been recognized by the Eighth Circuit Court of Appeals. Notice must include time and place, a clear statement of the purpose of the proceedings, and the possible consequences, factual basis, and statement of legal standard authorizing termination. Matter of A.L.P., supra, at 619.
There is no failure of procedural due process in this case and none has been specifically raised by the parents. Parents have not attacked the notice of hearing. No specific claim has been made under procedural due process. We believe the parents were provided every legal right under procedural and substantive due process. No fundamental unfairness has been demonstrated.
We affirm.
FOSHEIM and MORGAN, JJ., concur.
HENDERSON and SABERS, JJ., concur in result.
HENDERSON, Justice (concurring in result).
Obviously, if the nonverbal conduct was not intended to produce evidence as an assertion of incident(s) which happened before, all testimony of the child would be totally meaningless and absolutely irrelevant. In fact, it was a State's witness who testified "we use the dolls to demonstrate things that have happened. They can attach names to the dolls and therefore tell *87 their story in a way that is more comfortable for them through the play acting." (Emphasis supplied mine.) There is no doubt that the testimony of the social worker was hearsay. Inadmissible hearsay or admissible hearsay, that is the question.
I refer to J. Weinstein & M. Berger, 4 Weinstein's Evidence, ¶ 801(a)[01], at 801-60 (1985): "Although the notes to Rule 801(a) indicate that the burden is ordinarily on the opponent of the evidence to demonstrate that the intention existed, this does not apply where the proffer on its face indicates that the conduct is being used in a way that assumes it was intended by the actor as the equivalent of a statement." Therefore, the nonverbal conduct of the child must have been intended as an assertion of what allegedly happened in order that the evidence have any meaning. It is noted that the briefs of the State and of the children acknowledge that nonverbal conduct may constitute hearsay under SDCL 19-16-1. Any out-of-court assertive conduct of this child as to what allegedly happened constitutes hearsay evidence inadmissible under SDCL 19-16-4.
Appellees argue in the briefs that this hearsay evidence is admissible under the "residual exception" rule. Below, however, this was never advocated and there were no foundational requirements for admission established or entered by way of findings or even comments by the court. Therefore, the "residual exception" rule is inapplicable.
If we assume, hypothetically, that the requisite findings existed, the requirements of SDCL 19-16-35 were still ignored because appellants did not receive any notice of an intent to introduce this testimony under SDCL 19-16-35. This Court, in State v. McCafferty, 356 N.W.2d 159, 164 (S.D.1984), made it clear that the notice requirement was a critical provision of the residual exception rule.
The basic rule is that hearsay includes not only out-of-court statements made by a declarant (this is not an issue in this case) but also conduct of the declarant if the conduct is intended to be an assertion. United States v. Caro, 569 F.2d 411 (5th Cir.1978); United States v. Ross, 321 F.2d 61 (2d Cir.1963), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963). As each case is viewed, from the standpoint of a lawyer or judge, the legal mind must rivet upon the conduct of the declarant, which, indeed, is intended as an assertion. See Weinstein's Evidence, supra. Also, see 11 J. Moore, Moore's Federal Practice ¶ 801.01[3.-1] (2nd ed. 1985). Can there be any doubt, in light of the testimony of the social worker, that the conduct was an assertion when she testifies: "They can attach names to the dolls and therefore tell their story in a way that is more comfortable for them through the play acting"? (Emphasis supplied mine.) Let us look at the practical side of the reliability of evidence in this case. We have a six-year-old child portrayed by the majority opinion as extremely environmentally deprived, with violent behavior problems and socially delayed behavior, then being prompted by an adult/authority figure. The movements of the child with the anatomical dolls, however objective the social worker might be, is subject to interpretation by the witness, namely, the social worker. The social worker, after interpretation, then verbalizes the conduct without giving the parents or their attorney a chance to either (a) be at this demonstration, or (b) cross-examine or question the child. Cf. State v. Logue, 372 N.W.2d 151 (S.D.1985). It strikes me as being a terribly unfair way to secure evidence and this unreliable manner was used in this case. I believe that my interpretation of the hearsay rule and any exception thereunder is consistent with Federal Rule of Evidence 801. I fully appreciate that the hearsay rule is riddled with exceptions; however, I steadfastly maintain that in the present case, there was no exception to the hearsay rule which was advanced to the trial court as grounds for admission into evidence. Were this singular damning evidence against the parent employed as grounds for termination, I would readily dissent to the termination. However, such is not the case.
*88 I concur that the termination of the parental rights by the circuit judge was proper at the trial court level and sustainable in the appellate court. These children did not understand any of the basics or goodness of cleanliness. A bar of soap was handed to C.L. and he held it for a minute and asked "What do I do with this?" C.L. could not use a handkerchief or a kleenex and he would spoon his food to the edge of a plate and then scrape it into his mouth. C.L. urinated on the bathroom walls and carpet and would mess in his pants. He was often left alone, to include at night. He was frequently hungry; his body reeked with foul odors. There was alcoholism and violence in the home. This was exposed unto the children. There was also evidence of physical abuse unto C.L. R.P. was a baby, and a fight broke out between the parents over feeding him. During this fight, a window was broken. During the melee, the baby was thrown about and one parent exclaimed "Here, you feed him." The baby was brought to the Department of Social Services by the father. R.P., the baby, was removed from the home that very day. Even the parents expressed concern about providing the baby with food, clothing, and shelter. The baby did not thrive and although it is not clear from the record, it can be gleaned that only one-half of an ounce was gained in a period of approximately one month. Soon the baby was hospitalized and it was determined that he had aseptic meningitis, viremia, congenital hypothyroidism, and food intolerance. Because of the unique needs of this child, the child required special formulas. These formulas had to be alternated. Continuing throughout the critical first months of this child's life, the parents' life remained most unstable. Having no money, and no income, the county paid rent for several months. The parents were ultimately evicted from an apartment and they moved in with a relative. This couple was also receiving chemical dependency counseling. In fact, there were some 16 sessions undertaken to try to establish an abstinence from drinking alcoholic beverages. Testimony of Dr. Van Griethuysen was to the effect that the parents were both alcoholics. Apparently, the parents made some progress in understanding that they had a problem. However, aggressive behavioral patterns still lingered. Thereafter, there were long and repeated conferences on hygiene, motivation, and self-improvement. Still, there was a great deal of violence in the home. Experts were brought in to work with these parents to try to establish them as normal, functioning adults. Finally, it was determined by the officials of the State of South Dakota that these two children needed a home other than the one in which they were being raised. It appears that all available services had been provided and the basic problems remained unsolved. This thought brings me to the fact that the clock can run out on children. Their time is now to eat, be nourished, and raised in a decent way. Like a flowernot like a weedthey must be tenderly nurtured. In Matter of S.L.H., 342 N.W.2d 672, 681 (S.D.1983) (Henderson, J., concurring in part and dissenting in part), I quoted words that literally freeze, in time, the cry of children who need help now:
 WE ARE GUILTY
 OF MANY ERRORS AND
 MANY FAULTS
 BUT OUR WORST CRIME
 IS ABANDONING THE CHILDREN,
 NEGLECTING THE FOUNTAIN OF LIFE.
 MANY OF THE THINGS WE NEED
 CAN WAIT. THE CHILD CANNOT.
 RIGHT NOW IS THE TIME
 HIS BONES ARE BEING FORMED, HIS
 BLOOD IS BEING MADE, AND
 HIS SENSES ARE BEING
 DEVELOPED.
 TO HIM WE CANNOT ANSWER
 `TOMORROW.'
 HIS NAME IS `TODAY.'
Gabriela Mistral, Nobel Laureate of Chile. Without any question, the State of South Dakota looked after the children's best interests; termination was the least restrictive *89 alternative. Although I truly believe the trial court erred in a rule of evidence, as I have depicted above, this error is harmless when one reviews the overwhelming evidence that these children were dependent and neglected children and need a chance in life to flourish other than being raised in an environment of deprivation. An error is not grounds for reversal unless it is prejudicial. Matter of M.W., 374 N.W.2d 889 (S.D.1985). In an action tried to the court without a jury, many factors which would be considered prejudicial in a case tried to a jury will not be so held. Sabbagh v. Professional & Business Men's Life Ins. Co., 79 S.D. 615, 116 N.W.2d 513 (1962). The error, to be prejudicial, must be such so that in all probability it produced some effect upon the final result and thereby affected the rights of the party assigning it. Matter of M.B., 288 N.W.2d 773 (S.D.1980). It was only necessary for the court to find by clear and convincing evidence that the termination of parental rights was the least restrictive alternative available to serve the children's best interests.
SABERS, Justice (concurring in result).
I concur in the result only. The social worker's testimony relating to the child's play-acting, (improperly denominated "non-assertive conduct") constitutes inadmissible hearsay. As the majority correctly notes, hearsay includes nonverbal conduct if it is intended as an assertion. SDCL 19-16-1(1)(b); Bawdon, 386 N.W.2d at 487. Here, the child's behavior with the anatomically correct dolls was offered to prove the sexual abuse. This is implicit in the trial court's exclusion of the child's verbal statements made during the same activity. Although the trial court erred in admitting the testimony and the majority furthers that error, the evidence supporting termination of Mother's and Father's parental rights was substantial. The social worker's testimony was merely cumulative to other properly admitted evidence and resulted in harmless error. State v. Thomas, 381 N.W.2d 232, 239-240 (S.D.1986).