384 N.W.2d 670 (1986)
In the Matter of S.M., Alleged Dependent Child.
No. 15093.
Supreme Court of South Dakota.
Submitted on Briefs February 11, 1986.
Decided March 26, 1986.
*671 John E. Burke, Sioux Falls, for appellants parents.
Janice Godtland, Asst. Atty. Gen., Pierre, for appellee State; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.
Lee R. Burd, Sioux Falls, for S.M.
HERTZ, Acting Justice.
The parents of S.M. appeal from the trial court's order which terminated their parental rights. We affirm.
B.M. the mother, and C.M. the father, both of whom are appellants herein, are the parents of three daughters. The M.'s children are all named S.M. The oldest daughter was born on March 22, 1982. The middle daughter, and the only child concerned in this appeal, was born on March 12, 1983. The last daughter was born on May 29, 1984.
S.M. was born seven weeks premature on March 12, 1983. B.M. delivered the child through an emergency cesarean section operation. S.M. weighed four pounds one and one-half ounces at birth. She was stable and did not have premature lung disease. S.M. was in the intensive care unit for seven weeks. B.M. did not visit the infant regularly due to the fact that she had another toddler at home, and because she was recovering from the surgery. At the time of S.M.'s birth, B.M. was seventeen years old.
The record suggests that B.M. may have been physically abused by her own father. She experienced many problems with her parents, especially in regard to C.M., of whom her parents did not approve. C.M. is the father of all three children. Although the older daughter was born out of wedlock, C.M. and B.M. were married before S.M. was born.
On September 6, 1983, the State of South Dakota, (State), filed a petition which alleged that S.M. was a dependent and neglected child in accordance with SDCL 26-8-6. The petition alleged that the Department of Social Services, (Department), continued to receive complaints concerning the lack of proper care for the M.'s children, that the family had been living in a car, and that a Sioux Falls pediatrician had seen S.M. and confirmed the need for intervention.
S.M. was removed from the M.'s home on September 2, 1983, and placed in protective custody. A police officer brought the child to the Children's Inn, (C.I.), which is a temporary shelter for abused women and children. The C.I. counselor who was on duty when S.M. was admitted, testified that the reason why the child was brought to the shelter was alleged abuse on the part of the father.
B.M. had previously taken refuge at C.I. on June 25, 1983. At that time, she stated that C.M. had been abusing her and that she was afraid her children were in danger. B.M. indicated that he had hurt the girls in the past, and had beaten her (B.M.) that day. The C.I. counselor discussed the various options available to B.M. at this time. B.M. and her mother decided to go to the police station. Shortly thereafter, B.M.'s mother called C.I. and stated that B.M. and C.M. had reconciled because the police *672 could not help. At the termination hearing on May 2, 1985, B.M. denied that her husband had ever abused her or the children.
S.M. was hospitalized on June 29, 1983, because she was coughing and having trouble breathing. She was in the hospital for twelve days during which time her breathing problems cleared up. As part of S.M.'s hospital discharge plan, the M. family was referred to the Visiting Nurses Association, (V.N.A.). V.N.A. provides nursing or parenting skills in the home. In the instant case, the doctors were concerned about S.M. because they had received reports that she was not receiving proper care, was very small and sick, and because B.M. was very young and immature. Over the summer of 1983, V.N.A. nurses visited the M. family.
During July and August of 1983, the V.N.A. nurses had a difficult time locating the M.'s. They moved frequently and often stayed with family and friends. During August of 1983, the M.'s lived in a car with their two daughters. B.M. claimed at trial, however, that they only slept in the car a few nights. The car was a 1964 Mercury Montclair which had been converted into a pickup. The back seat had been removed so the family was confined to the front seat.
A V.N.A. nurse visited the M.'s home on September 2, 1983. S.M. weighed fourteen ounces less than she had weighed on August 3, 1983. The nurse reported that S.M.'s disposable diaper was saturated with urine, and that the older child's leg had dried feces on it. B.M. had dressed S.M. in a dish towel because she had no more diapers to put on the child. At this time, the nurse observed bruises about the body, and a large scratch on the back of S.M.'s head. As a result of this visit, the nurse called the Department. Thereafter, a Department supervisor and social worker went to the M.'s home to determine whether the baby's bruises were serious. They tried to convince C.M. and B.M. to take S.M. to a doctor. Only after the social workers threatened them with police intervention did C.M. and B.M. finally agree.
Consequently, the social workers brought the child, who was accompanied by B.M., to the clinic for an examination. The pediatrician, Dr. Blake, (Blake), was concerned about S.M.'s bruises because B.M. could not give him an adequate explanation for them. She told the doctor that S.M. had slept on the floor one night, and when S.M. awoke, she had the bruises. B.M. did not know how the abrasion on the top of S.M.'s head had occurred. However, she stated that the older daughter had pinched S.M. on the arm.
Blake diagnosed S.M. as a suspected abused or neglected child based on the numerous bruises, the varying ages of the bruises, and the lack of an adequate explanation for the bruises from B.M. As mentioned initially, S.M. was removed from the home and placed in protective custody at C.I. on September 2, 1983. S.M. remained there for five days. On September 7, 1983, S.M. was placed in foster care.
After S.M. was removed from the M.'s, both parents blamed their older child for the baby being at C.I. At the trial on May 2, 1985, both parents denied physically abusing their children. They continued to blame the older child for the bruises on S.M., however, each parent's version was slightly different. C.M. claimed the bruises occurred when the M.'s were living in the car because the older child stepped on S.M. while C.M. was reading the phone book or newspapers. B.M. claimed that when they lived in the car, the older child kicked the younger child during her sleep.
On November 1, 1983, C.M. and B.M. admitted that their daughter, S.M., was dependent and neglected and signed a stipulation. The stipulation provided in relevant part:
(1) Respondent parents will regularly counsel with Kathy Buchholtz and/or such other persons or agencies as she may designate.
(2) Respondent parents will faithfully attend such counseling, training, and educational sessions, meetings or classes as Kathy Buchholtz or her successor may designate for the purposes *673 of improving parenting skills or otherwise designed to improve their suitability as parents.
(3) Respondent parents will permit the guardian of any child in their care or any person designated by the Court to see and examine, at all reasonable times and places, any child then in their custody and will fully cooperate with such person in evaluating their circumstances and progress.
(4) Respondent parents will peacefully surrender any child in their custody should that child's guardian so require.
(5) The child above named shall remain in suitable foster care until such time as his guardian shall deem it prudent to place said child on a trial basis with respondent parents subject to removal at any time.
(6) The parents will cooperate with the Home-Based Program.
(7) The parents will participate in the Domestic Abuse Program.
(8) The parents will cooperate with the Visiting Nurses Association.
(9) The parents will complete psychological testing and will sign release forms.
Over the next eighteen months the record indicates that the M.'s failed to fulfill the conditions set forth in the stipulation to ensure the return of S.M. to their home. At trial, the State called a number of Department social workers, counselors, and medical professionals, all of whom had contacted and attempted to work with the M. family from November of 1983, until the termination hearing on May 2, 1985. Inasmuch as the services offered to the M.'s proved unavailing, the Department recommended terminating C.M. and B.M.'s parental rights because it had offered every service it had, as well as other community resources, and the M.'s did not follow through with the services, they made little progress over the eighteen month period, and their family situation remained substantially the same.
At the termination proceeding in May of 1985, C.M. was 20 years old and B.M. was 19. C.M. had completed school through 9th grade and B.M. did not finish high school. A third daughter had been born to them on May 29, 1984. At this time, C.M. was unemployed, and the M. family's living arrangements were unstable.
The trial court entered Findings of Fact, Conclusions of Law, and an Order terminating the parental rights of B.M. and C.M. on June 20, 1985. On appeal, the M.'s claim that termination of their parental rights was not the least restrictive alternative under the circumstances of this action.
We wrote in Matter of S.S., 334 N.W.2d 59 (S.D.1983), that whether or not a dependency and neglect exists is a matter of fact for the trial court. As such, SDCL 15-6-52(a) specifically states that such findings shall not be set aside by this court unless they are clearly erroneous. Id. at 61. In the case at bar, the M.'s admitted that S.M. was dependent and neglected, and thereafter, entered into the stipulation on November 1, 1983. The record shows that each parent was represented by counsel, they executed the stipulation voluntarily, they knew that they had to fulfill the conditions set forth in the stipulation in order to regain custody of S.M., and they were aware that termination of their parental rights was a possible remedy in the proceedings.
In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court prescribed the application of at least the "clear and convincing evidence" standard of proof to a state's termination of parental rights proceeding, as required by the Due Process Clause of the 14th Amendment. Thus, in Matter of S.S., supra, we stated the standard of review in termination cases as, "whether the trial court was clearly erroneous in finding the evidence supporting termination was clear and convincing." Id., 334 N.W.2d at 62.
We held in Matter of R.Z.F., 284 N.W.2d 879, 882 (S.D.1979), that "while we recognize that the fundamental nature of parents *674 rights to their children mandates at least a reasonable effort to aid such parents, we must bear in mind that the best interests of the child must always prevail." Similarly, in People In Interest of S.M.M., 349 N.W.2d 63, 64 (S.D.1984), we held that in determining whether to terminate parental rights, the paramount consideration is the best interests and welfare of the child. Furthermore, the termination of parental rights is not conditioned upon the exhaustion of every possible form of assistance. People In Interest of C.L., 356 N.W.2d 476, 478 (S.D.1984). The least restrictive alternative in termination cases is viewed from the child's point of view. Id. at 479.
Thus, in termination cases, the trial court must find by clear and convincing evidence that termination of parental rights is in the child's best interests. Matter of D.H., 354 N.W.2d 185, 188 (S.D.1984). Before parental rights may be terminated, the state must show that there is no narrower means of providing for the best interests and welfare of the child. In re N.J.W., 273 N.W.2d 134 (S.D.1978). Termination of parental rights is justified where attempts to assist a parent in providing better care for a child are unsuccessful, Matter of R.Z.F., 284 N.W.2d at 882; and where efforts to assist the parent through the use of social services prove unavailing. People In Interest of S.M.M., at 349 N.W.2d at 65.
In the instant case, the trial court specifically concluded as a matter of law that it found by clear and convincing evidence that termination of C.M. and B.M.'s parental rights is the least restrictive alternative available to serve S.M.'s best interests. This court does not decide factual issues de novo; the question before this court is not whether it would have made the same findings the trial court did, but whether the entire evidence leaves a definite and firm conviction that a mistake has been committed. Matter of D.H., 354 N.W.2d at 188. (Citations omitted.)
Here, the M.'s argue that termination was not the least restrictive alternative. However, the evidence before us in the record is quite clear. At the time the Department became involved with the M.'s they were teenage parents with two children, unemployed, and with unstable living arrangements. Additionally, allegations of spouse and/or child physical abuse were present.
During the next eighteen months, the social workers attempted to involve, or referred the M.'s to an exhaustive number of programs, agencies, and services to enable them to regain custody of S.M. The record indicates that the M.'s failed to realize the seriousness of S.M.'s removal from their home and showed little initiative in involving themselves with the services offered.
Ron Reidel, (Reidel), was the Department's intensive placement worker for the M. family. The program was designed to have the placement worker spend as much time with the family as necessary with the hope of keeping the family together. Reidel identified the M.'s problems as inappropriate discipline of the older daughter, inappropriate care regarding the physical needs of both children, marital discord, alleged spouse abuse by C.M. upon B.M., housing problems, and unemployment.
Reidel testified, among other things, that the M.'s never admitted to having any problems; that they did not sign the case service plans; that they denied abuse of S.M., and blamed the older child; that their attendance at parenting classes was spotty; and that they failed to attend Parent's Anonymous, (P.A.), classes which was a condition to the reinstatement of the Department's services. (The Department's services had been temporarily withdrawn from the family on December 20, 1983, due to the M.'s lack of progress).
Reidel testified that he received limited cooperation from the M.'s at all stages of his contact with them. However, he stated that B.M. was more receptive to the program than her husband. Reidel also testified that he observed little initiative on the part of the M.'s to involve themselves in the various services offered to the family. Reidel aided the family in obtaining food stamps and low-income housing.
*675 Kathy Buchholtz, (Buchholtz), was the Department's case worker assigned to the M. family. At trial, she testified that there were no services left to enable S.M. to remain with the M.'s. Buchholtz recommended termination of the parents' rights to S.M., based on the fact that the numerous resources offered to the M.'s had not been followed through with pursuant to the terms of the stipulation. She remarked that the family was not in a stable home environment, that little had changed since the M.'s had begun working with the Department, and that C.M. and B.M. had not appeared to take seriously the removal of S.M. from their home.
Children's Inn counselor, Connie Olson, (Olson), was involved in the Domestic Abuse Project. B.M. had been ordered to participate in the program pursuant to the stipulation. Olson testified that at the intake meeting in January of 1984, B.M. only admitted to a very small amount of violence which occurred in the distant past. Olson knew from the C.I. records that this was incorrect. Thereafter, Olson determined that B.M. was an inappropriate candidate for the program because B.M. indicated that there was no violence presently occurring in her family.
William Lowe, (Lowe), directed the Domestic Abuse Project. C.M. was advised by the case worker to contact him in accordance with the stipulation. Following two appointments which he failed to keep, C.M. met with Lowe on April 16, 1984. Lowe testified that he did not complete the intake process with C.M. because it was evident early on that C.M. was inappropriate for the project. Lowe stated that C.M. denied abuse of any sort, either of his wife or his children. Lowe further stated that it is important for people who are involved in an abusive situation to take responsibility for the abuse and admit it.
Overnight visits with the M.'s began in June of 1984. The foster mother testified that S.M. always returned hungry from an overnight visit. However, she admitted that S.M. was usually returned at her normal feeding time. The foster mother further stated that after the overnight visits started, S.M. began to wake up at night frightened and crying. As such, the foster mother could not get her back to sleep. According to the foster mother, S.M. also became more aggressive after the overnight visits began.
On August 18, 1984, S.M. was returned to the foster home after an overnight visit with her parents. The foster mother noticed a very red mark on her cheek. Upon further investigation, the foster mother observed a slap mark with fingerprints. At the termination proceedings C.M. and B.M. testified that they knew nothing about this slap mark on S.M.
At trial the M.'s claimed that Parent's Anonymous was not responsive to their problems. They also stated that they did not attend the meetings due to ill health and car problems. However, the M.'s did complete the parenting classes at Children's Inn, for which they received a certificate. B.M.'s aunt testified at trial that she would be willing to take guardianship of S.M. temporarily. She stated, however, that she did not want the child for more than a year.
In In re N.J.W., supra, we affirmed the trial court's order which terminated both parents parental rights. Moreover, we found that termination was the least restrictive alternative inasmuch as the parents had resisted attempts to provide assistance for their problems. Id., 273 N.W.2d at 140. In N.J.W., the parents tried to lay the blame for their children's condition on to poverty and an alien culture, rather than neglect. The Native American parents in N.J.W., had problems with excessive alcohol consumption which is not an issue in the instant action. Nevertheless, we wrote, "the poverty and neglect that flow from dissoluteness and profligacy are common to all races and demand action to protect the innocent victims." Id.
Here, the M.'s attorney argued passionately in his brief that the M.'s impoverished circumstances, their immaturity, limited intelligence and education, and difficulty in *676 conforming to the Department's bureaucratic guidelines do not form a basis for termination of their parental rights. He points out that the M.'s have made progress, albeit gradual, over the eighteen months that they were involved with the Department from living in a one seat car to their somewhat improved condition at the time of the termination hearing.
However, as we wrote in N.J.W., [if this] "were just a matter between the State and the appellants, their argument would be more persuasive, but since this argument focuses primarily on the welfare of the children their argument fails." Not unlike the parents in N.J.W., C.M. and B.M. have been accommodated by the Department in every possible way. The social workers testified that the M.'s were resistant to the programs and services offered to them, and that their attendance at classes required by the stipulation was erratic. Not surprising is the fact that at trial, both parents stated that they were now willing to cooperate with the Department or court under any circumstances to get S.M. back. However, the evidence shows that this was not their attitude after they signed the stipulation, nor during the following eighteen months.
Little had changed for the M.'s at the time of trial on May 2, 1985. C.M., no longer a teenager, continued to have no prospective employment possibilities. He testified that from January of 1985 to May 2, 1985, he had worked for at least part of a day for a total of approximately three weeks. C.M. had worked at a number of temporary jobs, which included stacking pork bellies onto pallets, unloading trucks, and helping a farmer. B.M. had given birth to another child. The family had just moved to LaVerne, Minnesota on April 29, 1985, and they were preparing to move back to Sioux Falls on the day of trial. Thus, their living arrangements continued to remain unstable at the time of the hearing.
In Matter of J.M.V.D., 285 N.W.2d 853 (S.D.1979), the State's witnesses indicated that when the family resided in Henry, South Dakota, their living conditions were filthy; and then when they moved to Rapid City, the family lived in a tent and a car. At the time of the termination hearing, however, the parents stated that they had just bought a trailer house, that they had more money, that the husband was looking for work, and that the mother would try to be cleaner. We, nevertheless, affirmed the trial court's order which terminated both parents rights over an epileptic child who was already in special foster care.
Thus, in J.M.V.D., we stated that, "when it comes to something as important as the welfare of young children, promises of the parents to conform to the standard of care for their children which is expected in our society do not carry as much weight as their past actions of not properly caring for their children." Id., 285 N.W.2d at 855. In the case at bar, the trial court had only the M.'s conduct after signing the stipulation to use as an indicator in determining whether or not to terminate their parental rights. As such, the record contains extensive testimony by the social workers and counselors assigned to work with C.M. and B.M., all of whom agreed that the M.'s were not receptive to the services and continued to deny that any abuse had occurred either between the spouses or with their children.
Not unlike the M.'s situation, the mother in Matter of S.A.H., 314 N.W.2d 316 (S.D. 1982), failed to maintain independent living arrangements, steady employment, or regular visitation with her child who was in foster care, during the period of time leading up to the termination hearing. We affirmed the termination of the mother's parental rights in S.A.H., given that the Department's attempts to assist her with money management, vocational training, and parenting skills were met with an unwillingness to accept assistance. Id., 314 N.W.2d at 317.
Here, the Department had provided the M.'s with the intensive placement program and counseling by the case worker. The social workers had helped the M. family *677 find low-income housing, apply for food stamps, and provided them with transportation. Furthermore, the M.'s were involved with or referred to other programs which included: the Visiting Nurses Association, parenting classes at Children's Inn, Turnabout Program, Home-Based Program, Parent's Anonymous, Domestic Abuse Project, and the Family Abuse Project. However, both C.M. and B.M. failed to follow through with these services except for the parenting classes at Children's Inn, and they continued to deny abuse, showed little initiative in getting involved with the programs, and failed to fulfill the conditions set forth in the stipulation. As mentioned previously, termination of parental rights is not conditioned on the exhaustion of every possible form of assistance. People In Interest of C.L., 356 N.W.2d at 478. We are satisfied that the Department made every effort to assist C.M. and B.M. through the use of social services, but that these efforts proved unavailing due to the M.'s unwillingness to accept and follow through with the assistance.
The trial court in this case viewed the evidence and listened to the testimony of the witnesses. It determined that the evidence clearly and convincingly showed that termination of C.M. and B.M.'s parental rights was the least restrictive alternative for the welfare and best interests of S.M. "It is incumbent upon this court to be duly aware of the opportunity the trial court has to judge first hand the credibility of the witnesses." Matter of J.M.V.D., 285 N.W.2d at 855. Therefore, we cannot say that the findings were clearly erroneous based upon the record, facts, and circumstances of this case.
We accordingly affirm the order of the trial court.
All the Justices concur.
SABERS, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.