**The PEOPLE of the State of South Dakota in the Interest of T.H. and J.H., Children and Concerning D.H., Father and T.C., Mother.**

**No. 15270.**

Supreme Court of South Dakota.

Considered on Briefs Sept. 19, 1986.

Decided Nov. 12, 1986.

amount recovered shall not be subject to any statutory limitation."

Larry D. Plank, Black Hills Legal Services, Rapid City, for appellant T.C.

Janice Godtland, Asst. Atty. Gen., Pierre, (Mark V. Meierhenry, Atty. Gen., Pierre, on brief), for appellee State.

James Waggoner, Rapid City, for appellees Children.

SABERS, Justice.

Mother appeals the trial court's order terminating her parental rights. We affirm.

### Facts

T.C. (Mother), is the mother of T.H. and J.H., the minor male children who are the subjects of this action. Presently, T.H. is five (5) and J.H. is three (3) years of age. The father of these children is D.H. (Father). Mother and Father have never been married. Having failed to perfect his appeal, Father is not a party to this action. At the time of the Dispositional Hearing on August 19, 1985, Mother was 24 years old.

The children were taken into protective custody and placed in foster care by the South Dakota Department of Social Services (Department) in August of 1984. The children remain in foster care.

The Department took charge of the children in Rapid City, South Dakota, when Mother was arrested on a warrant from Nebraska for shoplifting. She spent three days in the Pennington County jail before extradition to Gering, Nebraska. Mother was convicted of two misdemeanors of receiving stolen property and was sent to the Nebraska Penitentiary. Father could not be located to take care of the children in August of 1984. He was incarcerated in Nebraska in October 1984, for a second offense of misdemeanor shoplifting. Father was eligible for parole in January, 1985, with straight time of October 1985.

Mother and Father were returned to Rapid City from Nebraska to face pending charges in late March of 1985. They were both imprisoned in the Pennington County jail. Mother was transferred to the Women's Correctional Facility at Springfield, South Dakota, in July 1985. She must serve a one year sentence in South Dakota for her first felony offense. Her sentence began July 1, 1985. Father was scheduled for release from the Pennington County jail on October 9, 1985.

Mother has been incarcerated twice in Nebraska. She spent fourteen months in the Nebraska Penitentiary for the felony of theft by receiving. Additionally, she was arrested for shoplifting in Omaha but the charges were dropped. Mother and Father also spent 25 days in the York County jail for two misdemeanors. They stole merchandise from a Pamida store in York, Nebraska, and were caught when they tried to pawn it.

Department's social worker, Tina Anderson (Anderson), was assigned to this case. While Mother was incarcerated in Nebraska, Anderson arranged phone calls and letters between Mother and her children. After the parents were returned to Rapid City in March 1985, Anderson arranged weekly visits between them and the boys from April 12, 1985, through late June of that year. The visits were discontinued as a result of Mother's transfer to the Springfield facility.

### Trial Court Findings

The children were adjudicated dependent and neglected children on May 28, 1985. The Dispositional Hearing was held on Au-

gust 19, 1985. The trial court entered Findings of Fact, Conclusions of Law, and an Order terminating Mother and Father's parental rights on October 24, 1985. On November 21, 1985, the Dispositional Order was amended to allow the Department to place the children for adoption.

The trial court found the following facts, in part:

—Factual circumstances had not materially changed since the Adjudicatory Hearing because the parents were still incarcerated as a result of their criminal behavior;

—The children had been treated like just "so much baggage" by Mother and Father who have no parenting abilities and have led a transient lifestyle; all of which has had an adverse affect on the best interests of the children;

—The parents have little or no employment prospects and have had little or no employment in the past that would allow them to adequately care for the children;

—There is no permanent commitment between the parents who have no extended family to provide assistance;

—When the children were first taken by Department they were both in poor physical and mental health:

1. T.H. was fixated on death and violent play acting,

2. Both children were speech delayed and environmentally deprived, and

3. Both children had flat heads, the probable result of being left on their backs in cribs for long periods of time;

—The parents continue to place their needs over those of the children and there appears no effective bonding between the parents and children;

—Due to the parents incarceration, Department has had limited access to this family for the purpose of attempting to rehabilitate them;

—Since Department took custody of the children in August 1984, the parents have been continually incarcerated and the children have, from the start, thrived and continue to thrive in foster care;

—The children need a stable and nurturing family environment now, and cannot afford to wait, at a minimum, several years for the parents to provide this;

—There has been physical violence in this family, and the suspicion of inappropriate sexual behavior;

—The least restrictive alternative is viewed from the children's point of view, and the likelihood of stability for these children, which they so desperately need, is too remote for the risk involved to them to place these children in the home of their parents when they are released from prison. The court will not gamble with the children's future;

—The parents incarceration was but one factor considered by the court in its ultimate decision; and

—Each of the court's Findings of Fact are supported by and based upon clear and convincing evidence.

### Mother's Claims

Mother claims that the trial court was clearly erroneous in concluding that terminating her parental rights was the least restrictive alternative where the Department failed to provide her with rehabilitative services while she was incarcerated. Mother further claims that termination was not based on clear and convincing evidence.

1. WHETHER TERMINATING MOTHER'S PARENTAL RIGHTS WAS THE LEAST RESTRICTIVE ALTERNATIVE BASED UPON ALL THE FACTS AND CIRCUMSTANCES OF THIS CASE?

The United States Supreme Court has prescribed the application of at least the "clear and convincing evidence" standard of proof to a state court's termination of parental rights proceeding. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Therefore, in *Matter of S.S.*, 334 N.W.2d 59, 62 (S.D.1983), this

court enunciated the standard of review as, "whether the trial court was clearly erroneous in finding the evidence supporting termination was clear and convincing."

■ Although we recognize that the fundamental nature of parents rights to their children mandates at least a reasonable effort to aid them in retaining their offspring, it must be borne in mind that the best interests of the child must always prevail. *Matter of S.M.*, 384 N.W.2d 670, 673–674 (S.D.1986). Thus, in determining whether to terminate parental rights, the paramount consideration is the best interests and welfare of the child. *Id.* Furthermore, termination of parental rights is not conditioned on the exhaustion of every possible form of assistance. *People In Interest of J.S.N.*, 371 N.W.2d 361, 364 (S.D. 1985). Nor are services mandated in every case. *In Re B.E.*, 287 N.W.2d 91, 95 (S.D. 1979). The least restrictive alternative is viewed from the child's point of view. *People In Interest of C.L.*, 356 N.W.2d 476, 478 (S.D.1984). Accordingly, in termination cases, the trial court must find by clear and convincing evidence that termination of parental rights is in the child's best interests, and the State must show that there is no narrower means of providing for the best interests and welfare of the child. *S.M., supra.*

■ The trial court found by clear and convincing evidence that termination of Mother's parental rights was the least restrictive alternative available to serve the children's best interests. We do not decide factual issues de novo; the question before this court is not whether it would have made the same findings the trial court did, but whether the entire evidence leaves a definite and firm conviction that a mistake has been committed. *Matter of D.H.*, 354 N.W.2d 185, 188 (S.D.1984); *Wiggins v. Shewmake*, 374 N.W.2d 111 (S.D.1985). Moreover, we give due regard to the opportunity of the trial court to judge the credibility of the witnesses. SDCL 15–6–52(a). For the reasons set forth below, we hold that the trial court's decision was not clearly erroneous.

### Mother's Background

Mother was first involved with the juvenile justice system as a run-away when she was eleven years old. She was kicked out of her home in Illinois at the age of 14, and thereafter lived by herself in Denver, Colorado, for the next several years. She supported herself by taking a variety of fast-food related jobs. Mother is not a high school graduate. Mother met Father in Denver when she was 16 years old. It appears from the record that she was pregnant at this time, and that Father is not T.H.'s biological father. After T.H. was born, the parents traveled around the midwest taking odd jobs here and there. For two years, they lived in three different locations in Oklahoma, and then went to the Omaha area. During this period of time, J.H. was born. Thereafter, Mother, Father, and the two boys went to Hot Springs, South Dakota, where the parents decided to split up for awhile. Father returned to Nebraska leaving Mother and the children with little money, and no means of transportation.

Mother took the children to Rapid City. She found work as a bar maid. It was after she failed to pick up the children from an inappropriate caretaker, (one who was characterized as mentally deficient), that Department intervened and took custody of the children in August of 1984. The evidence shows that the Department had little choice but to place the children in foster care due to Mother's extradition to Nebraska, and Father's abandonment of the family.

### Children's Condition

When the Department first took the children, they were filthy, malnourished, and environmentally deprived. At this time, Anderson estimated T.H. to be two years old and J.H., approximately six to eight months old. In fact, T.H. was three years old and J.H. was fourteen months old. The backs of both boys' heads were flat. Dr. Judson B. Reaney, a developmental pediatrician, testified that this is commonly seen

in an infant who is left laying in a crib on its back and not tended to frequently enough to prevent the bones from flattening out. Although Mother stated this resulted from the way she carried in pregnancy, Reaney testified that this type of condition, where the bones themselves are flattened out, is never the result of pregnancy.

Both boys were speech delayed. J.H. had no speech when he entered foster care at age fourteen months. His head was large in comparison to his body, he was lethargic, reeked of urine, exhibited little fear, and had a high pain threshold. T.H. had an articulation problem, and his speech was hard to understand when he entered foster care at the age of three years, two months. He was also undernourished, smelled, and the foster mother noticed him drinking from the toilet bowl.

Dr. Reaney was called in to work with T.H. because he was constantly involved in violent play acting. The evidence suggests that T.H. was preoccupied with violence because he witnessed Father shoot his pet dog. Reaney found the child's play significant. He indicated that T.H. had some special problems regarding violence and that T.H. must have learned this behavior somewhere. In all, Reaney saw the children a total of seven times, and the parents once.

Anderson and Reaney both testified that they observed no significant bonding between the children and their parents during the supervised visits. Furthermore, they observed that the parents had a difficult time putting the children's needs first. Anderson stated that Mother and Father tickled the children incessantly, and failed to stop even when it was apparent that the children were uncomfortable with this activity. Anderson and Reaney attributed many of T.H.'s problems with parenting to her own chaotic upbringing which included an alcoholic mother and approximately six step-fathers, one of whom tried to rape her.

### Foster Care

By contrast, the children have blossomed in foster care. The record shows that they are physically and mentally healthier, their speech has improved, and on developmental tests, they have practically caught up to their chronological age. According to Reaney, the best confirmation of a diagnosis of environmental deprivation is the subsequent improvement of a child. If a child is removed from his environment and a sudden blossoming of ability occurs in areas where he was previously delayed, this confirms the diagnosis. Here, the evidence supports the trial court's finding that these children have thrived, and continue to thrive in foster care.

### Stability

In *J.S.N.*, we held that the best interests of the children require that some certitude and stability enter their lives. 371 N.W.2d at 364. According to Anderson's testimony:

Children need to develop trust. They need to have a consistent caretaker, someone that is there for them to feed them, to nurture them, to meet their needs, whether its medical or scholastic needs. If they're in limbo, these needs are not met. They do not develop the trust that is necessary for going on to further stages of development. A child needs to know that they can depend on something.

The evidence shows that these children have experienced very little, if any, stability in their young lives when left in Mother's care.

Stability is crucial to the welfare and best interests of a child. In *C.L.*, we wrote:

This court has affirmed the termination of parental rights based on a trial court's conclusion that there was no indication in the mother's past conduct, or her present circumstances, that the conduct would improve in the future.

356 N.W.2d at 479, *citing Matter of M.S.M.*, 320 N.W.2d 795 (S.D.1982).

Mother's testimony revealed that she has no definite plans for the future, except for

getting back together with Father after her release from prison. She possesses limited education and no skills. She denied that the children were inadequately cared for when the Department intervened in August 1984 or that she had any problems as a parent. Mother had the following exchange with the children's counsel during cross-examination:

> *Counsel:* It is your testimony that prior to today, you have never before to anyone admitted that you had any problems in parenting your children, isn't that correct?
>
> *Mother:* That's correct.
>
> *Counsel:* In fact while you were under oath at the adjudicatory hearing ... Isn't it a fact that you indicated that if the children were returned to you, you would continue to parent them just as you had up until the time they were taken, isn't that correct?
>
> *Mother:* Yes.
>
> *Counsel:* You have changed your mind now for this hearing?
>
> *Mother:* I think I was a good parent, but obviously I can see I have done something wrong. I'd like to better myself as far as parenting my children.
>
> *Counsel:* You still feel at this point in time that you are a good parent?
>
> *Mother:* Yes.

"[W]hen it comes to something as important as the welfare of young children, promises of the parents to conform to the standard of care for their children which is expected in our society do not carry as much weight as their past actions of not properly caring for their children." *Matter of J.M.V.D.*, 285 N.W.2d 853, 855 (S.D. 1979). The trial court only had evidence of Mother's past conduct and her present incarceration to use as a guideline in determining whether to terminate her parental rights. We also give deference to the trial judge's conclusion that Mother's testimony was patently unpersuasive. In ruling from the bench at the adjudicatory hearing, the trial judge stated:

> The respondent mother is either flagrantly lying or has no ability whatsoever to provide the needs and necessities of the minor children or no ability whatsoever to recognize the physical deficiencies of her children and, therefore, the children have not been provided with proper parental care.

Indeed, it appears from the record that Mother was unable to recognize that her parenting skills were in any way substandard.

### Recommendations

Dr. Reaney testified at the Dispositional Hearing on August 19, 1985. Reaney worked with the children right after they were placed in foster care. Later on, he was specifically asked to evaluate the children and interview the parents in connection with the resolution of this case. In recommending that the parents rights be terminated, Reaney stated:

> First, I don't think that there would be any guarantees that it would be possible for this family to be rehabilitated. Secondly, my professional opinion is that that would take a good deal of work and a good deal of commitment on the part of the parents. I also think that it would be a matter of years at a minimum for the parents to work on those issues. During that time and even perhaps after that initial period of intensive therapy, I think that under stress and duress that there would be a risk of things deteriorating if a parent lost a job or got laid off or there was marital discord and fighting, that would seriously affect the children, even if the therapy were ongoing. That's just a very risky kind of situation. I also feel that these children in the distress that I have seen them in, really can't afford to wait those years while if any kind of rehabilitative efforts were to take place, they have both already had much of their childhood seriously disrupted and at this point, I think that it would be very unwise and unfair to ask that they give up anymore of their childhood while their parents worked on their own issues.

At the same hearing, Anderson recommended terminating the parents' rights so

that the children could be placed in a permanent situation such as adoption. She testified in part as follows:

> I am concerned about the fact that the parents are incarcerated and the reason for incarceration. It was a criminal act. The separation that is involved with them being incarcerated is going to be a period—has already been a period of time and will require further time away from the children while they're incarcerated. Plus, I feel that the amount of time that is necessary to rehabilitate the parents and the fact that rehabilitation may not occur, will deprive the children of that contact with the parents for that much longer period of time. I feel that it could possibly take up to two years before the parents would be ready to parent the children and that is a long period of time which would leave the children in limbo, placing them in an unpermanent situation, so that would just interfere with their development.

### Incarceration

In his concurring opinion in the *Matter of A.M.L.*, 371 N.W.2d 358, 360 (S.D.1985), Justice Henderson discussed incarceration:

> As to the effect of incarceration, ipso facto, on termination of parental rights, there is a division of authority.... In 1982, the Supreme Court of Nebraska, in the case of *In re Interest of Ditter*, 212 Neb. 279, 284, 322 N.W.2d 642, 645 (1982), took what I consider to be an enlightened viewpoint of this general subject by stating: 'Although a parent's parental rights should not be terminated for the sole reason of conviction of a crime and incarceration, the fact of incarceration may be considered along with other factors in determining whether parental rights should be terminated.' (citation omitted) It strikes me that imprisonment is one of the factors that should be taken into consideration in the termination of a parent's right to a child, but that a court cannot blindly terminate a parent's rights without looking at the other facts and circumstances which would include the general fitness of the

parent and the length of period of incarceration.

It is evident from the record that the trial court considered Mother's imprisonment as one, but not the *sole* factor in its ultimate disposition of this case. Nor can we find that the Department was remiss in its duties to her. The evidence shows that Anderson arranged phone calls and letters between Mother and her children when she was jailed in Nebraska. Anderson also facilitated visits between both parents and the children when Mother and Father were returned to Rapid City. These visits were discontinued only when Mother was transferred to Springfield. The trial court specifically found that due to the incarceration of the parents, the Department, at best, had limited access to the parents for the purpose of attempting to rehabilitate the family. We agree with the trial court's conclusion that the Department made reasonable efforts, under the circumstances, to facilitate contact between Mother and her sons. We make no attempt to propound a rule for the Department in establishing a required course of rehabilitation in every case where one or both parents are incarcerated. Each case will turn on its own peculiar facts, and compelling circumstances may require different courses of conduct.

█ The children cannot afford to wait for their mother to acquire the parenting skills necessary to provide for their best interests and future well being. We agree with the trial court, and we will not gamble with the lives of these children either. "The law may not abandon children, rather it must permit them to grow and flourish." *J.S.N.*, 371 N.W.2d at 364. Viewed from the children's point of view, the least restrictive alternative was termination of Mother's parental rights; for it is her rights which must give way to accommodate the needs of these children and their best interests. *Id.*

We hold that the trial court was not clearly erroneous and that the termination was based on clear and convincing evi-

dence. Accordingly, we affirm the judgment in all respects.

All the Justices concur.