**The PEOPLE of the State of South Dakota In the Interest of K.C., a Minor Child, and Concerning V.M., L.C., and the Department of Social Services, Respondents.**

**No. 15456.**

Supreme Court of South Dakota.

Argued Feb. 18, 1987.

Decided Oct. 28, 1987.

Krista Clark, Mission, for appellant Father, L.C.

Janice Godtland, Asst. Atty. Gen., Pierre, for appellee, State; Mark V. Meierhenry, Atty. Gen., on the brief.

WUEST, Chief Justice (on reassignment).

This is an appeal by L.C. (Father) following termination of his parental rights in the minor child, K.C. We affirm.

Father married V.M. (Mother) in July, 1978. The couple divorced in February, 1979. A Montana divorce decree gave Mother custody of their ten-month-old daughter, K.C., and allowed Father reasonable visitation rights. Father made child support payments for two months but thereafter failed to provide further support for K.C. At this point, Father ended essentially all contact with his child.

Following the divorce, Mother moved to Lemmon, South Dakota. The Department of Social Services (Department) began receiving referrals on K.C. in September, 1979. Reports alleged neglect and incidents of physical abuse by Mother. Department initiated parental counseling for Mother.

Mother married A.B., Sr. in December, 1979. Their first child, A.B., Jr., was born in December, 1979. Their second child, A.B., was born in December, 1980. Reports of neglect and physical abuse continued, as well as reports of the open use of illegal drugs in the home. Department removed the three children from the home in August, 1981. The trial court terminated the parental rights of both parents in early 1982. The parents began an appeal in that action.

Over the next several years the children made significant gains in physical and mental development under the care of their foster parents but still suffered various medical and developmental problems. Mother's potential as a parent also appeared to improve, but she was estranged from her second husband during this period because of his continuing alcohol problem, his physical abuse, his relationship with another woman, and his lack of interest in the children.

Department returned the children to Mother's care in August, 1984, when the attorneys in the case stipulated the order terminating her parental rights should be vacated. Mother and the children moved in with Mother's grandparents. In September, 1984, the grandfather allegedly abused K.C. sexually.

Mother moved to a separate residence but permitted two or three other adult individuals to reside there with her. Department investigation indicated illegal drugs were being used in front of the children; the adults were sometimes allowing the children to drink alcohol; and, the children were being physically disciplined by several of the adults. On most occasions, the apartment was filthy. The children often went unsupervised, and seven-year-old K.C. was sometimes left in charge of the younger children. Mother failed to provide consistent meal preparation and a nutritious diet for her children.

In February, 1985, Mother gave birth to H.M. and R.M. The identity of the natural father is unknown.

Mother was sleeping with her boyfriend, J.S., who resided in her home. In April, 1985, K.C. was subjected to sexual abuse by J.S. on at least two occasions. Mother did not report the incidents to authorities, however, until July of 1985.

The trial court held a dependency and neglect hearing in August, 1985. All five children were found dependant and neglected. Father (L.C.) stated he would be willing to take custody of K.C.

The trial court held a disposition hearing as to all the children in March, 1986. Father indicated his desire to have K.C. and testified as to his recent background. The trial court concluded that termination of parental rights for Mother, Father, and A.B., Sr., was the least restrictive alternative in view of the best interests of the children.

Subsequent to the disposition hearing, Father, who did not have counsel at the hearing, requested counsel be appointed for him. His attorney then moved for rehearing because Father did not have counsel at the prior hearings.

Rehearing as to K.C. was held in June, 1986. Father again testified as to his recent history and reasons for wanting custody of K.C. After hearing the evidence the court concluded termination of Father's parental rights was the least restrictive alternative and in the best interests of K.C.

Evidence brought forward at the June, 1986, hearing indicates Father's employment in Montana ended shortly before his February, 1979 divorce. He left Montana a few months after the divorce and moved to Hettinger, North Dakota, where he resided with his mother and two adult brothers. Although Hettinger is close to Lemmon, South Dakota, and despite his right of visitation, Father had limited contact with his daughter.

Father moved to St. Anthony, North Dakota with his mother and two brothers in the summer of 1984. As of June, 1986, he was still residing in a trailer home with his mother and two brothers.

Except for several brief periods of part-time work, Father has been mostly unemployed since 1979. His total income in 1985 was somewhere between two and three

thousand dollars. Rather than find permanent employment in nearby Bismarck, North Dakota, Father has remained in a small town with limited employment opportunities. Similarly, as of June, 1986, neither of his brothers were employed. The mother's social security is the only stable source of income the household has been able to rely on.

Father appears to be irresponsible. He is continuously unemployed and seems to only get involved in various odd jobs. In fact, he had made no contact with Job Services for approximately a year. His total earnings in the eighteen months prior to trial was $3,000.00.

The home where the child would live with her Father, grandmother and two uncles is something which has been described from the exterior as a "hillbilly shack" and a "junkyard." The interior was described as cluttered and musty smelling. The home is not modern, in that the water well had caved in and they were hauling water from Mandan or Bismarck (25 miles away) in gallon jugs. Apparently they were using the outhouse and in colder weather were pouring water into the tank of the stool and periodically flushing it into the sewer system, connected to a septic tank.

At the March hearing, Father testified that a new well was being drilled and the water would be connected within four days. At that same hearing, his mother testified that the well would be connected to the water system in the spring. At the time of the June hearing, the water was still not connected and they were still hauling water from Bismarck or Mandan. Testimony was that they intended to get the well drilled soon.

Admittedly, raising a child in non-modern facilities, with the use of an outhouse and hauled water is not bad per se. However, the testimony of the Father is reflective of his possible lack of candor and certain irresponsibility by not following through with otherwise good intentions.

We do not believe Finding of Fact 14 is clearly erroneous. Admittedly, the Father did *suggest* to the Mother that she notify authorities of the sexual abuse of the daughter, and some weeks later he asked her if she had done so. However, he never personally made any attempt to take custody, visit or protect his daughter after becoming aware of the alleged sexual molestation. In reality, he did nothing!

During the several occasions in 1981–86, when the children were removed from the home and placed in foster care, the Father never asked for visitation rights of his daughter. In 1981–85 he had no real contact with her. In fact, as of March 27, 1986, he had not seen her for over a year nor had he sent her any gifts or cards. He did not even remember her birth date.

During certain occasions when the child was in foster care, removed from the care of the Mother, he continued his relationship with the Mother. In fact, she stayed with him for approximately one month in the summer of 1985 during which time they had sexual relations. It is abundantly clear that the daughter must be kept away from her Mother and the bad maternal influences. There seems to be a danger that Father would not enforce this proviso.

Father's abstinence from marijuana seems somewhat halfhearted. He testified that he had not used it "for awhile" and was "trying to get away from it." His main comments seemed to be "Who can afford it?"

Although he claims to be a member of a church, he attends only on religious holidays. This is true even though his mother attends church regularly, and he could easily join her.

The court believed K.C. needed a nurturing and stable home environment. The court was concerned about Father's occasional liaisons with his former wife since their divorce, and the court felt any reintroduction of Mother's presence would be harmful to K.C. Given the past sexual abuse of K.C., the court did not believe placement with Father was wise since his brothers resided in the home. The court also noted the bonding between K.C., A.B., Jr., and A.B., which the court felt should be preserved by keeping the children together if at all possible.

The testimony is clear that the existing bonding between K.C. and her brothers is manifestly important. To now separate her from her brothers would do a great disservice to her and possibly do violence to her best interests. The Department of Social Services indicates that they have every intention of keeping the children together, if at all possible. They should be given this opportunity.

The mental health professionals indicated that placement of K.C. should be viewed towards permanency. It was indicated that her previous transit background had been harmful and could be harmful in the future. The Father has lived a very transitory life with frequent changes in homes and employment. In the opinion of the psychologist this type of life would be harmful to K.C. were it to continue in the future.

Based on all the evidence, the trial court decided the least restrictive alternative commensurate with the best interests of K.C. required termination of Father's parental rights. The court entered this factual conclusion in both its findings of fact and conclusions of law. Father argues the court clearly erred in finding termination was in the child's best interest and the least restrictive alternative commensurate with the child's best interests.

In *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court held that before the State of New York could declare a child to be "permanently neglected," thereby authorizing termination of parental rights to the affected child, the state's allegations supporting parental rights termination must be proved by "clear and convincing evidence." "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact finding, is to instruct the fact finder concerning the degree of confidence our society thinks we should have in the correctness of factual conclusions for a particular type of adjudication." *Santosky*, 455 U.S. at 755, 102 S.Ct. at 1395

*citing Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). A "clear and convincing evidence" standard "adequately conveys to the fact finder the level of subjective certainty about his factual conclusions necessary to satisfy due process." *Santosky*, 455 U.S. at 770, 102 S.Ct. at 1403.

The ruling in *Santosky* increased the state's burden of proof at an adjudicatory hearing by requiring each allegation in the petition be proven by clear and convincing evidence. *People In Interest of S.H.*, 323 N.W.2d 851 (S.D. 1982). If the trial court finds that the allegations of the petition are supported by clear and convincing evidence in cases concerning dependent and neglected children, the court shall sustain the petition. SDCL 26-8-22.10.

*In Matter of S.S.*, 334 N.W.2d 59 (S.D. 1983), this court stated whether dependency and neglect exists is question of fact for the trial court. This statement is essentially accurate. The State must prove allegations of fact in its petition by clear and convincing evidence, and the trial court must determine the truth of the evidentiary facts offered by the State. The trial court must also satisfy itself that an ultimate fact which establishes dependency and neglect is similarly supported by clear and convincing evidence. An ultimate fact would be one of the factors listed in SDCL 26-8-6, such as whether, based on all the evidence, the court is able to find the child "lacks proper parental care,[1] or that the child's "environment is injurious to his welfare."[2]

Whether a child is dependent and neglected is probably more accurately viewed as a mixed law-fact question because when the court finds that an ultimate fact under SDCL 26-8-6 exists and has been proven by clear and convincing evidence, the court may conclude as a matter of law that the affected child is dependent and neglected as defined by SDCL 26-8-6. However, the trial court's primary analysis in reaching its decision is factual. If application of the rule of law to the facts requires an inquiry

---

1. SDCL 26-8-6(2)

2. SDCL 26-8-6(3).

that is 'essentially factual'—one that is founded *'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct,'*—then the lower court's determination should be classified as one of fact reviewable under the clearly erroneous standard. *Permann v. Dept. of Labor, Unemp. Ins. D.,* 411 N.W.2d 113 (S.D.1987).

The trial court's findings of fact will not be set aside by this court unless they are "clearly erroneous." SDCL 15–6–52(a). In applying this standard, the question before this court is not whether we would have made the same findings the trial court did; rather, the question is whether, after a review of all the evidence, we are convinced that a mistake has been made. *People In Interest of T.H.,* 396 N.W.2d 145 (S.D. 1986); *Matter of S.M.,* 384 N.W.2d 670 (S.D.1986); *Wiggins v. Shewmake,* 374 N.W.2d 111 (S.D.1985); *Matter of D.H.,* 354 N.W.2d 185 (S.D.1984). We must determine "whether the trial court was clearly erroneous in finding the evidence supporting termination was clear and convincing." *Matter of S.M., supra; Interest of T.H., supra; Matter of S.S., supra.*

In this case the issue is whether termination of Father's parental rights was the least restrictive alternative commensurate with the best interest of the child. The trial court entered its factual conclusion as both a finding of fact and a conclusion of law. As is the case with a finding of dependency and neglect, however, how we characterize this conclusion establishes our standard of review.

The *Santosky* decision arguably dealt only with the standard of proof in dependency and neglect adjudications. Nevertheless, this court has held the clear and convincing standard must be used at both the adjudicatory and dispositional stage of the proceedings. *Matter of D.B.,* 382 N.W.2d 419 (S.D.1986); *People in Interest of L.A.,* 334 N.W.2d 62 (S.D.1983). We have therefore held "the trial court must find by clear and convincing evidence that termination of parental rights is in the child's best interests." *Matter of C.L. and R.P.,* 397 397 N.W.2d 81 (S.D.1986); *Interest of T.H.,* 396 N.W.2d at 148; *Matter of S.M.,* 384 N.W.2d at 674; *Matter of D.H.,* 354 N.W.2d at 188. We have also held that the question whether termination is the least restrictive alternative is examined from the child's point of view. *Matter of C.L., supra; Interest of T.H., supra; Matter of S.M., supra.* In short, the trial court must "find" by clear and convincing evidence that termination is the least restrictive alternative commensurate with the best interests of the child.

We have never specifically ruled whether the determination by the trial court is a finding of fact or conclusion of law. However, we have implied that the least restrictive alternative and best interests of the child analysis is essentially an issue of fact for the trial court in that we have applied the clearly erroneous standard of review. *People In Interest of D.H.,* 408 N.W.2d 743 (S.D.1987); *Interest of T.H., supra; Matter of L.R.,* 394 N.W.2d 901 (S.D.1986); *People In Interest of G.H.,* 390 N.W.2d 54 (S.D.1986); *Matter of S.M., supra; Matter of D.H., supra.*

The trial court must enter its final determination as a conclusion of law since it must decree its final judgment in the case. The nature of the question before the court, however, is "essentially factual." The trial court makes a subjective determination as to the narrowest means of providing for the needs of the child. This ultimate finding of fact will not be overturned unless clearly erroneous.

■ The question for this court is whether the trial court's ultimate finding—that clear and convincing evidence indicated termination was the least restrictive alternative commensurate with the child's best interests—was clearly erroneous. We do not believe it was.

■ This is not the usual situation where clear and convincing evidence of dependence and neglect correlates almost exactly with the need for termination as to married parents. In this case only Mother had custody, and not all of the abuse and neglect attributed to her can be held against Father. Nevertheless, based on K.C.'s past abuse, her future needs, the lack of Father's interest in the child and his demon-

strated inability to provide for K.C. in the future, we do not believe the court's ultimate finding was clearly erroneous.

Affirmed.

MORGAN and MILLER, JJ., concur.

HENDERSON and SABERS, JJ., dissent.

HENDERSON, Justice (dissenting).

I dissent from the majority opinion for two reasons. First, it affirms a circuit court decision which was prejudicially contaminated with erroneous factual findings. Second, it wholly ignores the settled law of this state.

### FACTS

V.M. is the natural mother of minor children K.C., A.B., Jr., A.B., R.M., and H.M. L.C. is the natural father of only K.C. Mother's parental rights were terminated as to all the children. Father's parental rights were terminated as to K.C. Mother did not appeal. Therefore, this case singularly involves Father's appeal regarding termination of parental rights to his daughter, K.C.

Mother, born September 7, 1959, and Father, born June 14, 1957, were married on June 16, 1978, approximately two months after K.C.'s birth on April 21, 1978. They were divorced in Montana during March 1979 and Mother was awarded custody of K.C. Father was ordered to pay monthly child support of $100. Soon after the divorce, Father left Montana and journeyed to Hettinger, North Dakota, where he lived with his mother, F.C., and his older brother W.C. D.C., Father's other brother, lived nearby.

In the first two months following his divorce, Father met his support obligations and paid $100, monthly, to the Clerk of the specified Montana court. No additional child support payments were forwarded until 1984, when South Dakota Department of Social Services pursued Father and collected $800. Father claims his lack of payment resulted from his failure to find work, and lack of knowledge regarding Mother's whereabouts. It should be recalled, however, that Father was required to make child support payments to the Montana court clerk and not to Mother directly. Father remained in Hettinger for approximately one year, moved to Bismarck, worked sporadically there, and returned to Hettinger in the Spring of 1982. In July 1984, Father, his mother, and two brothers moved to St. Anthony, North Dakota, where they presently reside.

Mother, following the March 1979 divorce, moved to Lemmon, South Dakota, where she married A.B., Sr. on December 6, 1979, some four days after the birth of their son, A.B., Jr. This union produced another son, A.B., on December 24, 1980.

Mother experienced repeated problems parenting her children. She had constant contact with the South Dakota Department of Social Services (DSS) and in August 1981, she was relieved of custody of the children due to an alleged abuse of A.B., Jr., and the neglect of K.C. and A.B. In August 1984, Mother regained custody of her children. Mother and A.B., Sr. were divorced on February 7, 1985. The following day, Mother gave birth to twin boys, R.M. and H.M.

On August 8, 1985, a dependency and neglect petition was filed against Mother. All five children were placed in the custody of DSS. Removal of the children stemmed in large part from sexual abuse of K.C., in April 1985, by Mother's live-in boyfriend, J.S., in Mother's presence. A related incident also came to light; that being an alleged improper "touching" of K.C. by her maternal great grandfather in 1984. The Petition also alleged that the children were dependent and neglected as to their natural fathers, L.C. and A.B., Sr.

An Adjudicatory Hearing was held on August 22, 1985, whereat Father notified the court that he wanted custody of K.C. On March 27, 1986, at the Dispositional Hearing, Father again voiced his desire to obtain custody of his daughter. The court terminated Mother's and Father's parental rights, but upon being advised that Father did not fully understand the proceedings and wished to be represented by counsel,

the court appointed counsel for Father. A new dispositional hearing was ordered held to specifically address Father's parental rights. To better address K.C.'s possible placement with Father, a court-ordered Home Study was made of Father's St. Anthony residence. Colored photographs of this home are in evidence and reflect a modest home with a clean yard and a very orderly personal appearance within the home. Pictures of the kitchen area and the innards of this home reflect good housekeeping by the grandmother, who also has a very close and loving relationship with this little girl. To characterize this home as a "hillbilly shack" and as a "junkyard" does not square with the colored photographs in the record. During argument, to which there was no objection, counsel for the Father argued that a well had been drilled and that there was now water in the house. One of the brothers lives in another trailer home and apparently not in the home where the child could conceivably live in the future, per argument before this Court.

Social Worker Addie Ternes noted in her Home Study Report that Father, his two older brothers, and their mother inhabited the family's St. Anthony residence. While all family members were cooperative, Social Worker Ternes doubted that they were financially and emotionally capable of meeting K.C.'s needs. Neither L.C. nor his brothers had steady jobs and the only constant source of income was F.C.'s (Father's mother) monthly Social Security check of $340. Father and his brothers worked as carpenters when they could find jobs and reportedly brought home a combined monthly income of approximately $1,000. Father said he wanted K.C. to live with him, because he loved her, and wanted freedom to raise her as he chose. Father admitted to past marijuana use but claimed no current usage of illegal narcotics. A characterization of his attitude towards marijuana, found in the majority opinion, is just that—a characterization. In the Summary portion of her Home Study Report,

Social Worker Ternes wrote: "The court may want to consider foster care for [K.C.] for a specified period of time to allow [Father] a trial period to tangibly demonstrate his intent to prepare [K.C.'s] presence in his life." Social Worker Ternes never recommended his parental rights be terminated.

At the June 3, 1986 Dispositional Hearing, Social Worker Barbara Stoick, who had constant contact with Mother and her children, testified that Father, through the years, expressed minimal interest in K.C. and recommended against him being given custody of his daughter and recommended that Father's parental rights be terminated. However, *she also admitted that her office never initiated contact with Father regarding K.C., never actually worked with Father, and at no time attempted to place K.C. with Father.* Social Worker Stoick did report that Father occasionally telephoned to inquire about court hearing dates. She further noted that Father resided in North Dakota and was therefore beyond the jurisdiction of South Dakota DSS. She also noted that Father had never previously attempted to obtain custody of K.C.[1] An Order dated June 27, 1986, terminated Father's parental rights as to K.C. It appears from the record that the trial court did not interview the children nor do they appear to have been seen by the court. Father appeals.

## ERRONEOUS FACTUAL FINDINGS

Finding of Fact 14 states: "That Respondent [Father] made no attempt to take custody or visit or protect his daughter at that time [when he became aware that H.K. (K.C.'s maternal great grandfather) had allegedly sexually molested K.C.]." The settled record does not support this finding and the majority opinion selectively neglects to mention that when Mother notified him of this allegation, Father recommended she inform the authorities.

1. Father testified he never sought custody because (1) he did not wish to lessen Mother's custody chances; and (2) he was hoping it would be possible for K.C. to remain with her Mother and siblings.

Finding of Fact 18 states: "That Respondent [Father] had knowledge of the sexual molestation [of K.C.] which was committed by [J.S. (Mother's live-in paramour)] at that time." Yet, an independent review of the record reveals that *no* evidence exists to support this finding. On the contrary, the record indicates that Father was unaware of the alleged sexual abuse until *after* the children were removed from Mother's custody in August 1985. The majority opinion camouflages this obvious error by augmenting the circuit court's findings with its own dubious interpretation. Indeed, State's own brief, in attempting to lessen the effect of the lower court's clearly erroneous finding, implies that Father may have had knowledge because he "had regular contact with [Mother]." State's Brief, at 24. Even State, strenuously arguing in favor of termination, could not muster the creative skills necessary to conjure such a questionable interpretation as adopted by the majority. Likewise, the circuit court erred in Finding of Fact 23 wherein it stated: "That Respondent [Father] ... has paid no child support ... with the exception of some $300.00 back in 1979...." Clearly, the record reflects that Father paid an additional $800 in 1984 when pursued by the State of South Dakota.

As the record is devoid of any evidence supporting the above findings of fact, they are clearly erroneous and should be set aside. *See In re S.D.* 402 N.W.2d 346, 351 (S.D.1987); *In re T.H.*, 396 N.W.2d 145, 148 (S.D.1986); *In re B.E.*, 287 N.W.2d 91, 97 (S.D.1979). Additionally, these erroneous findings go directly to Father's fitness as a parent, are prejudicial error, and therefore reversible error. A circuit court, laboring under the misconception that a Father would take no action to rescue his young daughter from sexual abuse, would be remiss if it allowed that child to be placed in Father's custody. I submit that the integrity of the decision reached by the circuit court in this case was irreparably fouled by these erroneous factual findings. A preordained decision is not a just legal decision and should be reversed. I remain mindful that, *generally*, siblings should be kept together. *See Andersen v. Andersen*, 399 N.W.2d 363, 365 (S.D.1987); *In re G.H.*, 390 N.W.2d 54, 57–58 (S.D.1986). However, retention of a single sibling home should never provide the sole basis for termination of parental rights. In this case, we are concerned with termination of Father's parental rights to one child. Whether or not Father eventually retains custody, his parental rights should not be terminated for the singular reason of maintaining a common sibling home. Additionally, Social Worker Stoick testified as to the practical difficulties of placing all five children in one home and she noted circumstances may mandate that the children be separated.

## IGNORES SETTLED LAW OF THIS STATE

Father may not have been a model parent, but the settled record indicates that this parent-child relationship may have flourished if given proper, legally mandated encouragement. The settled record is devoid of evidence indicating that Father ever abused K.C., has a criminal record, or is an individual of serious undesirable and dangerous qualities. Clearly, Mother's nomadic lifestyle made it difficult for Father to regularly visit with his daughter and one can understand Father's reluctance to seek custody at an earlier date for fear he would endanger his former wife's custody chances and engender a Mother-siblings split.[2] Equally reflected by the record is Father's genuine concern for K.C. as evidenced via his gifts to her and his tenacious legal struggle to prevent permanent severance of parental ties. Further reflected by the record is the positive relationship existing between K.C. and Father and Father's family.

*See* comparable factual situation in *B.E.*, 287 N.W.2d 91 (S.D.1979), where this Court determined that the trial court's decision to terminate parental rights was clearly erroneous.

---

**2.** The majority opinion seems to punish Father for Mother's neglect when he was incapable of controlling or realistically preventing a situation of neglect occurring in the Mother's home.

"It is important to bear in mind that [a] parent[ ], natural or adoptive, ha[s] a fundamental right to [his or her] children," *In re N.J.W.*, 273 N.W.2d 134, 137 (S.D.1978), which the circuit court must balance "with the State's compulsion in protecting that child's best interests." *S.D.*, 402 N.W.2d at 352. *See G.H.*, 390 N.W.2d at 57–58; *In re S.M.*, 384 N.W.2d 670, 674 (S.D.1986); *In re P.M.*, 299 N.W.2d 803, 807 (S.D.1980). While the prevailing consideration is always the best interests and welfare of the child, parental rights may not be terminated unless "proffered State services are unaccepted or unsuccessful." *S.D.*, 402 N.W.2d at 352. *See S.M.*, 384 N.W.2d at 674 (citing *N.J.W.*, 273 N.W.2d at 140; *In re R.Z.F.*, 284 N.W.2d 879, 882 (S.D.1979)); *In re J.S.N.*, 371 N.W.2d 361, 364 (S.D. 1985); *In re S.S.*, 334 N.W.2d 59, 61–62 (S.D.1983). "[T]he fundamental nature of parents rights to their children *mandates* at least a reasonable effort to aid them in retaining their offspring...." *T.H.*, 396 N.W.2d at 148 (emphasis added).

I am troubled that the trial court did not view the adjudicatory phase and dispositional phase of this action in a different light. And this Court now seems to make the same judgment. The dispositional phase is to look to the future, while the adjudicatory phase looks to past actions. *P.M.*, 299 N.W.2d at 807. After the child was declared to be dependent and neglected, the least restrictive alternative should have come into play to include services to remedy the situation. For some reason, a myopic viewpoint of the adjudicatory hearing and facts is relied upon.

Of crucial and decisive importance to this case is that State made absolutely no effort to reunite Father with K.C. In fact, Social Worker Barbara Stoick testified that her office never initiated contact with Father regarding K.C., never actually worked with Father, at no time attempted to place K.C. with Father, and admitted that it was Father who telephoned her office to inquire about court hearing dates. Neither did DSS make available to Father information geared to improve his parenting skills, employment situation or living situation, even though it was those deficiencies upon which termination of parental rights was sought.

Parental rights should not be terminated when a parent was not given an opportunity to improve. Common sense and the settled law of this state forbid it. In the current case, the circuit court acted too hastily in terminating Father's parental rights.[3] Unfortunately, the majority opinion magnifies the error by erecting new law, on a shaky set of facts, and ignoring the settled law of this state. Termination of Father's parental rights is not in K.C.'s best interests nor does it reinforce the concept, long adhered to by this Court, that parents possess a fundamental right to their children.

A less restrictive alternative existed: namely, that L.C. receive counseling which would center on (a) financial responsibilities of raising a child; (b) the special emotional needs of a sexually abused and generally neglected child, such as K.C. might require; (c) any potential drug problem that he may have possessed in his immediate past. After a reasonable period of time, if L.C. improved his parental skills, another determination could be made con-

---

**3.** In view of a total failure on the part of the State of South Dakota to offer assistance to this Father or to help him improve his parenting skills, I quote from SDCL 26–8–35, which sets forth the various alternatives that are available to a trial judge:

When a child has been adjudicated to be neglected or dependent, the court shall enter a decree of disposition. When the decree does not terminate parental rights, it shall include one or more of the following provisions which the court finds appropriate:

(1) The court may place the child in the legal custody of one or both parents, a guardi-

an, or relative or other suitable person, with or without protective supervision, under such conditions as the court may impose;

(2) The court may place legal custody in the department of social services or a child placement agency for placement in a foster home or other child care facility; or

(3) The court may order that the child be examined or treated by a physician, surgeon, psychiatrist, or psychologist, or that he receive other special care, and may place the child in a hospital or other suitable facility for such purposes.

cerning placement of K.C. with him. In the meantime, until he received this counseling, and he received absolutely no help whatsoever from the DSS, the alternatives found in my footnote three were available to the trial judge. Lastly, this little girl has a fondness for her Father and I note, *inter alia,* that he made her a cradle for her dolly. He is poor but he loves his little girl and he should not be forever estopped from having an association with her. As it was written in *Santosky v. Kramer,* cited in the majority opinion, 455 U.S. at 753–54, 102 S.Ct. at 1395: "When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." (Footnote omitted.) Even the State's expert, assigned to this case, admitted a total breakdown by the DSS in attempting to help this Father. This action is contrary to our holding in *In re L.A.,* 334 N.W.2d 62 (S.D.1983). The United States Supreme Court in *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960), expressed: "In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (Footnote omitted.) Lawyers and judges have come to recognize this principle as being the "least restrictive alternative." I cannot join the majority opinion, as that principle has not been followed in this decision.

SABERS, Justice (dissenting).

I agree with Justice Henderson's dissent, especially that the Father was not provided an adequate opportunity to prove himself. Apparently, the local Department of Social Services refused to consider him because they were uninterested in working with someone in another state or did not know how to do so. This is hardly the *least* restrictive alternative or in the best interests of the child. I would remand to require that opportunity.