*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1342**

In the Matter of the Welfare of the Child of: A. L. and J. D. N., Sr., Parents.

**Filed December 28, 2015
Affirmed
Stauber, Judge**

Douglas County District Court
File No. 21-JV-15-343

Douglas R. Hegg, Hegg Law Office, Alexandria, Minnesota (for appellant father J.D.N.)

Christopher J. Cadem, Cadem Law Group, P.L.L.C., Fergus Falls, Minnesota (for respondent mother A.L.)

Chad M. Larson, Douglas County Attorney, Daniel C. Lee, Assistant County Attorney, Alexandria, Minnesota (for respondent Douglas County)

Anna Solheid, Alexandria, Minnesota (guardian ad litem)

Considered and decided by Stauber, Presiding Judge; Ross, Judge; and Kalitowski, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**STAUBER**, Judge

On appeal from a district court order determining that appellant-father's child is in need of protection or services (CHIPS), father argues that the findings are both unsupported by the record and insufficient to support the decision. We affirm.

## FACTS

Appellant J.D.N. is the biological father of C.L., born on February 9, 2006. At the time of the CHIPS order, J.D.N. had been in a relationship with S.L.D. for about nine years. The couple has four other children together, and S.L.D. is C.L.'s "de facto" mother.[1] S.L.D.'s parents, C.D. and D.D. (the grandparents), are also C.L.'s "de facto" grandparents.

The grandparents agreed to care for C.L. and one of her half-siblings (sister) beginning in July or August 2014. At that time, both J.D.N. and S.L.D. were using drugs. J.D.N. initially visited the children regularly when he was not in jail, but he visited less often beginning in December after he started using drugs again. J.D.N.'s visits stopped in January 2015, although he kept in contact via telephone.

After C.L. began living with the grandparents, J.D.N. had recurrent criminal violations and chemical-dependency issues. In June 2014, J.D.N. was found in contempt of court for leveling an outburst at the judge, for which he served forty-five days in jail. In August 2014, he pleaded guilty to gross-misdemeanor stalking—intent to injure, and

---

[1] C.L.'s biological mother has not had custody of her since 2009 and is not a party to this appeal.

received a stay of execution but was ordered as a condition of probation to complete a chemical-dependency assessment and follow the resulting recommendations. He admitted to heavy methamphetamine use, was diagnosed with severe substance abuse, and was referred to residential chemical-dependency treatment, which began in September 2014. J.D.N. left that program after two days, against staff advice, because he wanted to attend a dual-diagnosis program, but he did not enter another program until February 2015. During the time he was not in treatment, J.D.N. repeatedly violated probation by using amphetamines and methamphetamines, failing drug tests, and failing to keep in contact with his probation agent; he served increasingly lengthy jail sentences for these violations. After completing treatment in March 2015, J.D.N. did not follow through with hospital aftercare and tested positive for amphetamines and methamphetamines the following month. J.D.N.'s chemical assessor arranged for his re-admittance to treatment, but in May 2015, J.D.N. was excluded from reentering the program because he arrived late. That same month, J.D.N. violated probation by failing a drug test, and J.D.N. was ordered to serve 90 days in jail beginning in June 2015.

While residing with the grandparents, C.L. began to demonstrate mental-health and behavioral problems in late 2014. She was referred for mental-health services, and because she was withdrawn, her assessment was based partly on D.D.'s statements. According to D.D., C.L. worries about her parents and about living with her parents, avoids things that remind her of her parents, is anxious and very oppositional, has daily outbursts, has an excessive need for control, and physically assaults her sister. According to D.D., when C.L. lived with her parents she "did not have enough food, was locked in

3

closets, and [was] forced to take care of her younger siblings starting when she was as young as three." C.L. was diagnosed with unspecified anxiety disorder and referred for therapy and skills services.

When C.L.'s three youngest siblings were placed in emergency protective care in February 2015 due to a report that they were neglected and sick, the county also sought protective placements for C.L. and her sister. CHIPS petitions were filed with regard to all five children, and the county sought to ratify the preexisting arrangement for C.L. and her sister by naming the grandparents as their foster parents. The CHIPS petition alleged that C.L. was "without necessary food, clothing, shelter, education, or other required care" because J.D.N. was unable or unwilling to provide it; that she was in need of protection or services because of J.D.N.'s "emotional, mental, or physical disability, or state of immaturity"; and that her "behavior, condition, or environment" could be injurious to herself or others. *See* Minn. Stat. § 260C.007, subd. 6(3), (8), (9) (2014).

Following a two-day trial, the district court determined that C.L. was CHIPS, and that it was in her best interests to remain in the temporary custody of social services. At the time of the CHIPS order, J.D.N. was serving a two-month jail term for a probation violation and was required to enter treatment upon his release.

J.D.N. now appeals, but he did not order a trial transcript. He asserts that a transcript is not necessary for this appeal.

## DECISION

A parent is presumed to be a fit and suitable person to care for his or her child. *In re Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988). Before adjudicating a child as

4

CHIPS, the district court must determine that at least one statutory basis exists to support its decision. Minn. Stat. § 260C.007, subd. 6. The allegations of a CHIPS petition must be proved by clear and convincing evidence. *In re Welfare of S.J.*, 367 N.W.2d 651, 654 (Minn. App. 1985). On appeal from a CHIPS determination, this court is "bound by a very deferential standard of review." *In re Welfare of Child of S.S.W.*, 767 N.W.2d 723, 734 (Minn. App. 2009). "Findings in a CHIPS proceeding will not be reversed unless clearly erroneous or unsupported by substantial evidence." *In re Welfare of B.A.B.*, 572 N.W.2d 776, 778 (Minn. App. 1998). Findings are clearly erroneous only if "review of the entire record leaves the court with the definite and firm conviction that a mistake has been made." *Id*. (quotation omitted).

A child may be adjudicated CHIPS, if, among other reasons, the child is "without necessary food, clothing, shelter, education, or other required care for the child's physical or mental health or morals because the child's parent, guardian, or custodian is unable or unwilling to provide that care;" or "is without the special care made necessary by a physical, mental, or emotional condition because the child's parent, guardian, or custodian is unable or unwilling to provide that care." Minn. Stat. § 260C.007, subd. 6(3), (4). A "custodian" is "any person who is under a legal obligation to provide care and support for a minor or who is in fact providing care and support for a minor." Minn. Stat. § 260C.007, subd. 10 (2014). Appellant makes several challenges to the district court's CHIPS determination.

Appellant first asserts that there is no factual basis for a determination that he is "currently not available to parent or care for" C.L. This finding is fully supported by the

5

record. At the time of the CHIPS determination, appellant had been unavailable to parent C.L. for nearly a year due to his drug use and treatment and his repeated criminal violations that resulted in incarceration.

Appellant next argues that the district court erred by refusing to consider the reasonableness of his own decision to place C.L. with the grandparents while he was unavailable to parent the child. The district court found that appellant was C.L.'s "sole" custodian, but the record supports the finding that the grandparents were also "in fact providing care and support" for C.L. and could thus constitute proper custodians for C.L. under section 260C.007, subdivision 10. We agree with the district court that, while the grandparents did provide C.L. with proper care, the county nevertheless had a valid reason for initiating a CHIPS proceeding. J.D.N. could have "removed [C.L.] from the [grandparents'] home at any time, whether they had an agreement to the contrary or not." Thus, even if the grandparents could serve as temporary custodians within the meaning of section 260C.007, subdivision 10, J.D.N.'s reservation of his parental rights gave the county the authority to initiate a CHIPS action on C.L.'s behalf. The statute permits initiation of a CHIPS proceeding if a "parent, guardian or custodian" is unable or unwilling to provide care. This language does not preclude county involvement in this case.

Further, county intervention was independently supported by the onset of C.L.'s mental-health problems, which the record suggests were related to appellant's prior parenting conduct and lack of parental care. C.L. now has serious mental-health problems that stem, at least in part, from the lack of stability in her living situation and

failure to have her basic needs met. For this reason, because the grandparents do not have legal authority to parent C.L. without county intervention and because C.L. has clearly demonstrated the need for care that was not provided to her by appellant, the district court did not clearly err by intervening to formalize the grandparents' status as foster parents through a CHIPS proceeding.

Appellant next argues that "there is no finding by the court of any expert testimony linking the behaviors noted in . . . the court's [o]rder and the voluntary placement of the child with [the grandparents]." A licensed clinical professional counselor assessed C.L. in April 2015, and she was diagnosed as severely emotionally disturbed with an unspecified anxiety disorder, and found to be at risk of harming herself or others. The assessment notes that C.L.'s anxiety stems from concerns about her parents and sister, including that "she is worried she will have to go back to live with her parents and she does not want to. [C.L.] is very avoidant of things that remind her of her parents. . . ." The counselor testified at the CHIPS trial in July of 2015, but appellant did not order a transcript of that proceeding.[2] Thus, the existing record fully supports that the child was CHIPS. *See Bender*, 671 N.W.2d at 605.

Appellant further argues that the county's intervention in this case was premature. The record shows otherwise. C.L. has had a lack of stability in her life, and her basic

---

[2] The party who bears the duty to order a transcript for an appeal is "the party seeking review of the rulings being challenged[,] . . . [but] the lack of a transcript does not automatically require dismissal of an entire appeal. . . ." *In re Bender*, 671 N.W.2d 602, 605 (Minn. App. 2003) (citation omitted). Because we can decide issues raised in this appeal without a trial transcript, based on the documentary record, "the appeal need not be dismissed." *Id*.

needs have not been met by appellant. At the time of the CHIPS trial, C.L. had been out of home for nearly a year, and appellant was in jail for one of his successive probation violations and was required to participate in residential treatment upon his release. While appellant suggests that he properly placed C.L. with the grandparents, this arrangement was merely informal and did not transfer parental rights to the grandparents, nor did it alleviate C.L.'s unstable living situation or anxiety. Appellant's failure to properly parent C.L. himself provided the county with proper statutory grounds to initiate CHIPS proceedings.

Finally, appellant asserts that the record does not support the district court's finding that appellant failed to meaningfully comply with the out-of-home placement plan developed by the county because there was no need for a plan when he had arranged proper care for C.L. As the record contains clear and convincing evidence that supports the district court's determination that appellant is not currently able to care for C.L., we decline to further address this issue.

**Affirmed.**